**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CHICAGO FRANCHISE SYSTEMS, INC.,** an Illinois corporation, <br><br> **Plaintiff,** <br><br> v. <br><br> **YVES LESLY DOMINIQUE and DOMINUSDOMI LLC,** <br><br> **Defendants.** | **No. 1:22-cv-2396** |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, CHICAGO FRANCHISE SYSTEMS, INC., an Illinois corporation ("Chicago Franchise"), by its undersigned attorneys, for its Complaint for Injunctive and Other Relief against Defendants, YVES LESLY DOMINIQUE and DOMINUSDOMI LLC, a Georgia limited liability company (collectively, "Defendants"), states as follows:

## NATURE OF THE CASE

1.      This is an action for trademark infringement and dilution under the trademark laws of the United States, unfair competition, and breach of contract. This matter arises from Yves Lesly Dominique's ("Dominique") failure to comply with his contractual obligations to Chicago Franchise under a franchise agreement, now terminated, pursuant to which Dominique was granted the right to own and operate a Nancy's Pizzeria. Dominique breached his franchise agreement by failing to make payments of royalties and advertising fund contributions and by failing to comply with his post-termination obligations. Despite the fact that Dominique's franchise agreement has been terminated, Dominique and Dominusdomi LLC ("Dominusdomi") continue to operate a Chicago-style pizza restaurant from the formerly franchised premises,

using Chicago Franchise's menus, recipes, and copyrighted photographs, while alternatively advertising to the public that the restaurant is "Nancy's Pizza" and "formerly Nancy's Pizza."

2.      Chicago Franchise seeks, among other relief, a (a) preliminary and permanent injunction enjoining Defendants' wrongful and unlawful use of Chicago Franchise's federally registered trademarks, trade names, indicia, and other intellectual property and enforcing the post-termination obligations set forth in Section XI.D. of the franchise agreement and (b) judgment for damages incurred as a result of Dominique's breaches of the franchise agreement.

## GENERAL ALLEGATIONS

### The Parties

3.      Plaintiff Chicago Franchise is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Mokena, Illinois. Chicago Franchise is engaged in the business of granting licenses and franchises for the operation of Nancy's Pizzerias, which offer for sale pizza, pasta, and other food products and items.

4.      Defendant Dominique is a citizen of the State of Georgia who, upon information and belief, resides in Dunwoody, Georgia.

5.      Defendant Dominusdomi is a limited liability company organized and existing under the laws of the State of Georgia. Upon information and belief, Dominique is the sole member and manager of Dominusdomi.

### Jurisdiction and Venue

6.      This Court has original subject matter jurisdiction over this action because this is a civil action arising under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, jurisdiction being expressly conferred in accordance with 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a), and wherein

all other claims are so related within this Court's original jurisdiction that they form part of the same case or controversy.

7.     This Court also has original subject matter jurisdiction over this action because the matters in controversy exceed the sum of $75,000, exclusive of interest and costs, and this action is between citizens of different states, jurisdiction being expressly conferred in accordance with 28 U.S.C. §1332(a), in that (a) Plaintiff Chicago Franchise is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in the State of Illinois, (b) Defendant Dominique is a citizen of the State of Georgia, and (c) Defendant Dominusdomi is a limited liability company organized and existing under the laws of the State of Georgia and, upon information and belief, its sole member is Dominique, a citizen of the State of Georgia.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) because (a) a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred in this judicial district and (b) under Section XIII.E. of the franchise agreement at issue in this action, Dominique "irrevocably consents to the exclusive jurisdiction and venue of the courts of the State of Illinois and of any Federal court located in the State of Illinois, County of Cook, in connection with any action or proceeding arising out of or relating to" the Franchise Agreement.

## The Marks

9.     Chicago Franchise is now and since 1991 has been engaged in the business of granting licenses and franchises for the operation of Nancy's Pizzerias, which offer for sale pizza, pasta, and other food products and items, using Chicago Franchise's unique practices,

systems, procedures, methods, devices and techniques and variations thereof for the operation of those Nancy's Pizzerias.

10.     In connection with its licensing and franchising of Nancy's Pizzerias, Chicago Franchise licenses the use of certain trademarks, trade names, copyrighted photographs, recipes, and other ideas (the "Chicago Franchise System").

11.     The Chicago Franchise System has been used exclusively by Chicago Franchise and its franchisees and licensees in connection with the operation of Nancy's Pizzerias.

12.     In connection with its Nancy's Pizzerias, Chicago Franchise and/or its affiliates own the United States trademarks listed below (the "Marks"):

| Mark | Registration Date | Registration No. | Class/Use |
|---|---|---|---|
| **NANCY'S** | 3/16/1993 | 1,758,546 | Pizza, pasta, sandwiches/Restaurant services |
| **NANCY'S & Design**  | 5/27/1997 | 2,064,463 | Restaurant services |
| **NANCY'S PIZZA & Design**  | 11/13/2007 | 3,334,086 | Pizza, pasta, sandwiches/Restaurant services |

13.     The foregoing registrations are in full force and effect, and cover the goods and services identified above. These registrations are valid, existing, and incontestable under the Lanham Act, 15 U.S.C. § 1065.

14.     Chicago Franchise has expended considerable amounts of time, money, and effort in selecting, promoting, advertising, and associating the Marks with its business.

15.     The Marks, and all other registrations for trademarks or service marks which are part of the Chicago Francise System brand, have been in full force and effect since their registration and continue in full force and effect. All registrations which are eligible are incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

16.     Each registration set forth above is *prima facie* evidence of the validity of the registered marks and of Chicago Franchise's ownership of and right to use those marks in commerce on the services and goods listed above, as provided in 15 U.S.C. § 1057(b) and § 1115(a).

17.     The Marks are used to identify to the public the source of goods and services marketed by Chicago Franchise and represent to the public Chicago Franchise's high and uniform standards of quality, appearance, and service.

18.     For more than 50 years, Chicago Franchise or its predecessor has continuously used the Marks and its trade name "Nancy's Pizzeria" in interstate commerce in connection with the promotion, operation, and franchising of the Chicago Franchise System and the promotion and sale of the products and services they offer throughout the United States, including the State of Georgia.

19.     As a result of its extensive promotion, advertising, sales, service and the use of the Marks and trade names, and the superior quality of Chicago Franchise's products and services, Chicago Franchise has established and now enjoys valuable goodwill in its business represented by the Marks and trade names "Nancy's," "Nancy's Pizza," and "Nancy's Pizzeria," all of which have met with widespread public approval.

## The Dominique Franchise Agreement

20.     On or about March 21, 2017, Dominique entered into a Chicago Franchise Systems, Inc. Standard Franchise Agreement with Chicago Franchise (the "Franchise Agreement"). (A copy of the Franchise Agreement is attached hereto as **Exhibit 1**.)

21.     The Franchise Agreement granted Dominique the license and right, and he undertook the obligation, to operate a Nancy's Pizzeria using the Marks and the Chicago Franchise System, at a single location.

22.     Dominique established a Nancy's Pizzeria at 4705 C Ashford Dunwoody Road, Dunwoody, Georgia ("Dominique's Nancy's Pizzeria").

23.     Upon information and belief, Dominique operated Dominique's Nancy's Pizzeria through Dominusdomi.

24.     During the time that Dominique and Dominusdomi operated Dominique's Nancy's Pizzeria, they used the Marks, and advertised the telephone number ((770) 695-0606) (the "Telephone Number") in telephone directories and internet listings under various names which incorporated Chicago Franchise's proprietary marks and trade names, including but not limited to "Nancy's," "Nancy's Pizza," and "Nancy's Pizzeria."

25.     Under Section IV.D. of the Franchise Agreement, Dominique agreed to pay Chicago Franchise a continuing and non-refundable royalty in an amount equal to 6% of the gross sales generated from Dominique's Nancy's Pizzeria, which fees were due and payable on a weekly basis.

26.     Under Section IV.E. of the Franchise Agreement, Dominique agreed to pay Chicago Franchise a continuing and non-refundable advertising fee in an amount equal to 3% of

the gross sales generated from Dominique's Nancy's Pizzeria, which fees were due and payable on a weekly basis.

27.     Under Section IV.F. of the Franchise Agreement, Dominique agreed to submit to Chicago Franchise on a weekly basis all sales information and other information designated to be provided by Chicago Franchise.

28.     Under Section IV.L. of the Franchise Agreement, Dominique agreed that (a) he would pay a service charge equal to 1% of the previous week's gross sales each time he failed to timely provide the information required to be provided under Section IV.F. and (b) interest would accrue on outstanding amounts due to Chicago Franchise at the rate of 0.05% per day.

29.     Under Section XI.A. of the Franchise Agreement, Chicago Franchise may terminate the Franchise Agreement if "the Franchisee shall default in the performance of any of the duties, responsibilities or obligations provided for in this Standard Franchise Agreement… and further fails to cure and correct the foregoing, within fifteen (15) calendar days after the Franchisor gives written notice to Franchisee thereof."

30.     Under Section V.N. of the Franchise Agreement, "[u]pon the expiration or termination of this Agreement, the Franchisor may, at its sole and unlimited discretion, and without prior notice to the Franchisee…cause all such telephone and facsimile machine number service to and for the Restaurant to be…assigned to the Franchisor."

31.     Under Section V.O. of the Franchise Agreement, "Franchisor shall at all times during and after the term of this Agreement have unlimited rights to use the customer data base information contained in the Franchisee's computer hardware and software system for whatever purpose…."

32.     Under Section X.B. of the Franchise Agreement, following the termination of the same, Dominique agreed that he "shall not represent or advertise that the Franchisor and the Franchisee were formerly parties to a franchise agreement or that the Franchisee did business under the Trademarks or name of the Franchisor or any derivative thereof."

33.     Under Section XI.C. of the Franchise Agreement, Dominique agreed that in the event of a default, he "shall be liable to the Franchisor for all damages, costs, and expenses, including reasonable attorneys' fees."

### Dominique's Breaches, and Chicago Franchise's Termination, of the Franchise Agreement

34.     Beginning in or about October 2019, Dominique failed to pay royalties as required by Section IV.D. of the Franchise Agreement and failed to pay advertising fees as required by Section IV.E. of the Franchise Agreement.

35.     On October 28, 2019, Chicago Franchise notified Dominique of his defaults under the Franchise Agreement. (A copy of this Notice of Default is attached as **Exhibit 2**.)

36.     Dominique failed to cure these defaults within 15 calendar days as required by Section XI.A. of the Franchise Agreement.

37.     On February 5, 2020, Chicago Franchise again notified Dominique of his failure and refusal to pay royalties and advertising fees under the Franchise Agreement since October 2019. (A copy of this Notice of Default is attached as **Exhibit 3**.)

38.     Dominique failed to cure these defaults within 15 calendar days as required by Section XI.A. of the Franchise Agreement.

39.     On February 26, 2020, Chicago Franchise notified Dominique of its election to terminate his Franchise Agreement for his failure and refusal to cure his continuing defaults referenced above. (A copy of this Notice of Termination is attached as **Exhibit 4**.) In the Notice

of Termination, Chicago Franchise also notified Dominique of his post-termination obligations set forth in the Franchise Agreement and demanded that Dominique transfer the Telephone Number to Chicago Franchise.

40.     Dominique owns and operates a business named "Kiskeya Pizza" from the location of Dominique's Nancy's Pizzeria, which specializes in the sale of Chicago-style pizza (the "Infringing Business"). In violation of Section X.B. of the Franchise Agreement, Dominique advertises that the Infringing Business is "formerly Nancy's Pizzeria" and also represents to the public that the Infringing Business is a Nancy's Pizzeria.

41.     Despite the fact that the Franchise Agreement was terminated on February 26, 2020, in violation of Section X.B. of the Franchise Agreement, Dominique continues to:

      a.     Use the Marks and Telephone Number to promote the Infringing Business, including by advertising the Infringing Business as being "Formerly Nancy's Pizzeria." (*See* Google Business Page for "Kiskeya Pizza (Formerly Nancy's Pizzeria)" (all internet materials last visited May 2, 2022), a copy of which is attached hereto as **Exhibit 5**.)

      b.     Use the Marks by falsely attributing reviews from the Dominique's Nancy's Pizzeria to the Infringing Business. *See* Ex. 5.

      c.     Use the Marks on the exterior of the Infringing Business' premises. (*See* photograph attached hereto as **Exhibit 6**.)

      d.     Use the Telephone Number.

      e.     Use Chicago Franchise's recipes and menu.

      f.     Use Chicago Franchise's copyrighted photographs.

g.      Answer calls made to the Telephone Number as "Nancy's Pizzeria, thereby falsely representing to the public that the Infringing Business is an authorized Nancy's Pizzeria."

42.     Despite the fact that the Franchise Agreement was terminated on February 26, 2020, Defendants continue to use the Telephone Number that was associated with the former Franchise Business as the only the telephone number for the Infringing Business.

43.     Multiple business listing websites, including Google (*see* Ex. 5) DoorDash, Uber Eats, Slice, and the website of the Infringing Business continue to associate the Marks with the address of the Infringing Business and the Telephone Number used for Dominique's Nancy's Pizzeria. (*See* screenshots from each website, a copy of which are attached hereto as **Group Exhibit 7**.)

44.     As a direct result of Defendants' conduct, Chicago Franchise has received complaints in which customers mistakenly believe that the Infringing Business is a franchisee of Chicago Franchise and mistakenly attribute their complaints to the Chicago Franchise System. Chicago Franchise also receives complaints from other Atlanta-based franchisees that Defendants' actions are causing harm to their restaurants, their reputation, and the Chicago Franchise System.

## COUNT I
## LANHAM ACT – TRADEMARK INFRINGEMENT

### (Against All Defendants)

45.     Chicago Franchise realleges and incorporates by reference paragraphs 1 through 44 of the General Allegations as paragraph 45 of this Count I.

46.     Defendants' continued use of the Marks constitutes an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the Marks, and

Defendants' sale, offering for sale, distribution or advertising of goods and services under the Marks, or any marks similar thereto, is likely to cause confusion or mistake or to deceive the public in violation of 15 U.S.C. § 1114(1).

47.     Defendants' continued use of the Marks has caused and will continue to cause lost revenues, lost profits, and irreparable harm and injury to Chicago Franchise, the Chicago Franchise System, and its reputation and goodwill.

48.     Unless enjoined by this Court, Defendants will continue to use and infringe the Marks, causing Chicago Franchise irreparable injury. This threat of future injury to Chicago Franchise's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued use of the Marks and to ameliorate and mitigate Chicago Franchise's injuries.

**COUNT II**
**LANHAM ACT – UNFAIR COMPETITION**

**(Against All Defendants)**

49.     Chicago Franchise realleges and incorporates by reference paragraphs 1 through 44 of the General Allegations as paragraph 49 of this Count II.

50.     Defendants' acts, practices, and conduct constitute unfair competition, false designation of origin, and false or misleading descriptions or representations of fact, in that they are likely to cause confusion or to cause mistake, to deceive others as to the affiliation, connection, or association of the parties, and/or to misrepresent the nature, characteristics, qualities, or geographic origin of the parties' goods, services and commercial activities, all in violation of 15 U.S.C. § 1125(a).

51.     As a direct and proximate result of Defendants' unfair competition, Chicago Franchise has been irreparably injured, including injury to its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

52.     Chicago Franchise has no adequate remedy at law because the Marks are unique and represent to the public Chicago Franchise's identity, reputation, and goodwill, such that damages alone cannot fully compensate Chicago Franchise for Defendants' misconduct.

53.     Unless enjoined by the Court, Defendants will continue to compete unfairly with Chicago Franchise, to Chicago Franchise's irreparable injury. This threat of future injury to Chicago Franchise's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued unfair competition and to ameliorate and mitigate Chicago Franchise's injuries.

## COUNT III
## LANHAM ACT – TRADEMARK DILUTION

### (Against All Defendants)

54.     Chicago Franchise realleges and incorporates by reference paragraphs 1 through 44 of the General Allegations as paragraph 54 of this Count III.

55.     Defendants' acts, practices, and conduct, constitute an infringing use in interstate commerce of the Marks, and Defendants' sale, offering for sale, distribution or advertising of goods under the Marks despite the expiration of the Franchise Agreement causes dilution of their distinctive quality, in violation of 15 U.S.C. § 1125(c).

56.     As a direct and proximate result of Defendants' infringement, Chicago Franchise has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

57. Chicago Franchise has no adequate remedy at law because the Marks are unique and represent to the public its identity, reputation, and goodwill, such that damages alone cannot fully compensate Chicago Franchise for Defendants' misconduct.

58. Unless enjoined by the Court, Defendants will continue to use and infringe the Marks, to Chicago Franchise's irreparable injury. This threat of future injury to Chicago Franchise's business identity, goodwill, and reputation requires injunctive relief to prevent Defendants' continued dilution of the Marks and to ameliorate and mitigate Chicago Franchise's injuries.

## COUNT IV
## VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT

### (Against All Defendants)

59. Chicago Franchise realleges and incorporates by reference paragraphs 1 through 44 of the General Allegations as paragraph 59 of this Count IV.

60. The Georgia Fair Business Practices Act of 1975 Ga. Code Ann. § 10-1-390, *et seq.*, (the "Georgia Act") prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful." Ga. Code Ann. § 10-1-393(a).

61. The unauthorized use by Defendants of the Marks constitutes false, misleading, unfair, and deceptive acts or practices in the conduct of consumer transactions in violation of the Georgia Act.

62. The continued use by Defendants of the Marks has caused and will cause irreparable harm and injury to Chicago Franchise, and to its reputation and goodwill, for which Chicago Franchise has no adequate remedy at law.

## COUNT V
## BREACH OF FRANCHISE AGREEMENT

### (Against Dominique)

63.     Chicago Franchise realleges and incorporates by reference paragraphs 1 through 44 of the General Allegations as paragraph 63 of this Count V.

64.     The Franchise Agreement is a binding contract.

65.     As a direct and proximate result of Dominique's breaches of the Franchise Agreement, Chicago Franchise is entitled to receive the past due royalties and advertising fees described in the Franchise Agreement, together with interest on those amounts and attorneys' fees and costs incurred by Chicago Franchise in enforcing the Franchise Agreement pursuant to Section XI.C. of the Franchise Agreement.

66.     As of May 2, 2022, Dominique owed Chicago Franchise $88,063.37 in past due royalties, which amount does not include interest, or royalties on unreported sales due to Dominque's failure to provide Chicago Franchise financial documentation as required by Section IV.F. of the Franchise Agreement.

67.     As of May 2, 2022, Dominique owed Chicago Franchise $44,031.69 in past due advertising fees, which amount does not include interest, or advertising fees on unreported sales due to Dominque's failure to provide Chicago Franchise financial documentation as required by Section IV.F. of the Franchise Agreement.

68.     Chicago Franchise has fully performed all obligations required to be performed.

WHEREFORE, Plaintiff, CHICAGO FRANCHISE SYSTEMS, INC., requests this Court enter judgment in its favor and against Defendants, YVES LESLY DOMINIQUE and DOMINUSDOMI LLC, jointly and severally, as follows:

a.      A preliminary and permanent injunction prohibiting Defendants, their members, managers, agents, servants, employees, and attorneys, and those other persons who are in active concert or participation with any of them, from using the Marks, the trade name "Nancy's", and any trademark, service mark, logo, or trade name that is confusingly similar to the Marks, and requiring them to immediately:

i.      deliver to Chicago Franchise all goods and materials containing the Marks;

ii.      cease using the Marks and Chicago Franchise's proprietary and confidential information, including without limitation all operations manuals and point-of-sale computer-installed menu and recipe files and customer databases, and deliver all such materials to Chicago Franchise;

iii.      de-identify the Infringing Business by making all changes required to be made so as to distinguish Defendants' business premises from an authorized Nancy's Pizzeria;

iv.      remove or cause to be removed any website, social media, telephone directory, or other listings that associate the address or the Telephone Number of Dominique's Nancy's Pizzeria or the Infringing Business with Chicago Franchise or the Marks;

v.      remove or cause to be removed all reviews attributed to Dominique's Nancy's Pizzeria that are now associated with the Infringing Business or reflected on the Infringing Business' social media or review websites; and

vi.      notify the telephone company and all listing agencies of the termination of Defendants' rights to use any telephone number and any classified or other telephone

directory listings associated with Dominique's Nancy's Pizzeria, including without limitation take all action to transfer the Telephone Number, and authorize and instruct their transfer to Chicago Franchise or in the alternative discontinue the Telephone Number.

      b.      An order requiring Defendants to file with the Court and to serve upon Chicago Franchise's counsel within ten (10) days after entry of any injunction or order issued herein, a written report, under oath, setting forth in detail the manner in which they have complied with such injunction or order;

      c.      An amount equal to the unpaid royalties and advertising fees and royalties and advertising fees that would have been payable to Chicago Franchise through the expiration of the Franchise Agreement plus accrued interest pursuant to Section IV.L of the Franchise Agreement;

      d.      An award of attorneys' fees and costs pursuant to Section XI.C of the Franchise Agreement; and

      e.      Such other and further relief as this Court deems just and appropriate.


Dated: May 6, 2022

                        Respectfully submitted,


                        /s/ Michael J. Boxerman
                        Attorney for Plaintiff

Michael J. Boxerman mboxerman@marcusboxerman.com
Míle Knabe mknabe@marcusboxerman.com
MARCUS & BOXERMAN
20 N. Clark Street, Ste. 3300
Chicago, Illinois 60602
(312) 216-2730

COUNSEL FOR PLAINTIFF

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **CHICAGO FRANCHISE SYSTEMS, INC.,** an Illinois corporation, <br><br> **Plaintiff,** <br><br> v. <br><br> **YVES LESLY DOMINIQUE and DOMINUSDOMI LLC,** <br><br> **Defendants.** | **No.** |

**CHICAGO FRANCHISE SYSTEMS, INC.'S LOCAL RULE 3.2 STATEMENT**

Plaintiff, Chicago Franchise Systems, Inc., has one affiliate: The Howey Family Trust Dated March 20, 2014.

Dated: May 6, 2022

Respectfully submitted,

/s/ Michael J. Boxerman
Attorney for Plaintiff

Michael J. Boxerman mboxerman@marcusboxerman.com
Míle Knabe mknabe@marcusboxerman.com
MARCUS & BOXERMAN
20 N. Clark Street, Ste. 3300
Chicago, Illinois 60602
(312) 216-2730

COUNSEL FOR PLAINTIFF

# EXHIBIT 1

## CHICAGO FRANCHISE SYSTEMS, INC. STANDARD FRANCHISE AGREEMENT

AGREEMENT, made and entered into at Atlanta, Georgia this 21st day of March, 2017, by and between Chicago Franchise Systems, Inc., an Illinois corporation having its principal place of business located at 18861 90th Avenue, Suite H, Mokena, Illinois 60448, (708) 478-8440 (hereinafter referred to as the "Franchisor"), and Yves Lesly Dominique of 635 Varina Way, Alpharetta, Georgia 30022 (hereinafter referred to as the "Franchisee").

### W I T N E S E T H:

WHEREAS, the Franchisor owns and/or has the right to use and grant licenses and franchises for the use of one or more trademarks and/or service marks (hereinafter sometimes collectively referred to as the "Trademarks") for which Federal and/or other Trademark Registrations presently exist or for which applications are pending or may be hereafter filed, pursuant to which the Franchisor does own, license and franchise systems for cooking, preparing and merchandising through "Nancy's Pizza Restaurants" (formerly known as "Nancy's Pizza Express Restaurants" and "Nancy's Pizzerias") a variety of pizza, pasta, sandwiches and other food products and items, which systems may include (but shall not necessarily include) the use of trade secrets, specialized cooking equipment, stylized store premises, menus, food containers, trade dress, slogans and identification schemes, all of which may be changed, improved and further developed from time to time (such systems being hereafter collectively referred to as the "Nancy's Pizza System"); and

WHEREAS, the Franchisee desires to be assisted, trained and licensed by the Franchisor to use the Nancy's Pizza System, the Franchisee recognizing and acknowledging the benefits to be derived from being identified with the Trademarks, and the Nancy's Pizza System, and assisted, trained and licensed by the Franchisor for the use thereof; and

WHEREAS, the Franchisee understands and acknowledges the importance to the Nancy's Pizza System of the Franchisor's high and uniform standards of quality, appearance and service and the necessity of conforming the Franchisee's Nancy's Pizza Restaurant therewith; and

WHEREAS, the Franchisee has advised the Franchisor that the Franchisee has been thoroughly advised by counsel of his own selection, whose name and address are as follows: _____ of all the terms, conditions and provisions of this Agreement and the Franchisor's current Franchise Disclosure Document.

NOW, THEREFORE, for and in consideration of the mutual covenants and conditions herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

I.    PREAMBLE

– 1 –

The preamble to this Standard Franchise Agreement is incorporated herein and made a part hereof by this reference.

II.    GRANT AND PREMISES

A.     Subject to the terms and conditions of this Standard Franchise Agreement and the continuing good faith performance hereof by the Franchisee, the Franchisor hereby grants to the Franchisee a license and franchise to establish and operate a Nancy's Pizza Restaurant (hereinafter sometimes referred to as the "Restaurant") utilizing the Trademarks and the Nancy's Pizza System at one (1) location within the following non-exclusive geographic area (such non-exclusive geographic area being hereinafter referred to as the "territory"): within the city limits of Sandy Springs, Georgia and Perimeter City, Georgia.

Such non-exclusive geographic area is for purposes of determining the ultimate location of the Restaurant only, and is not a grant of any area, market or territorial rights. Any similarity in size and/or configuration between such non-exclusive geographic area and the geographic area hereinafter set forth in Subsection II F is coincidental.

B.     The specific location of the Restaurant within the territory (hereinafter referred to as the "franchised premises") shall be determined by the Franchisee subject to the Franchisor's prior written consent, such consent not to be unreasonably withheld and such consent to be based by the Franchisor upon a number of factors. Such factors may, but shall not necessarily include population density, traffic patterns, size and cost, and similar factors, as well as the Franchisor's best estimate of available market potential and the proximity of other Nancy's Pizza Restaurants to the Franchisee's proposed location. A Chicago Franchise Systems, Inc. Franchise Agreement must be signed and the initial franchise fee paid before the Franchisee shall sign a lease or otherwise acquire real estate for the franchised premises.

C.     The Franchisee shall conduct business from the franchised premises only after the franchised premises shall have first been improved, decorated, furnished, equipped and supplied pursuant to and in strict conformity with the plans and specifications provided and/or approved by the Franchisor. The franchised premises shall at all times during the term hereof and any extension thereto continue to remain improved, decorated, furnished, equipped, and supplied pursuant to and in strict conformity with the plans and specifications provided and/or approved by the Franchisor.

D.     During the entire term hereof and all extensions thereto, if any, the franchised premises shall be used only by the Franchisee (or the Franchisee's successors and assigns as hereinafter specified) and shall be used solely for the purpose of operating a Nancy's Pizza Restaurant pursuant to the terms of this Standard Franchise Agreement.

E.     The franchise granted herein is for the franchised premises only and except as hereinafter set forth nothing herein shall be construed as or shall be a grant of any other area, market or territorial rights, however the Franchisee shall be, and hereby is permitted to advertise and solicit business for the Restaurant within any area, market or territory, it being hereby

– 2 –

acknowledged and agreed to by the Franchisee that other Nancy's Pizza Restaurant Franchisees and the Franchisor itself may also solicit business and make food deliveries within any area, market or territory, inclusive of, but not necessarily limited to the area within which the franchised premises are located as hereinafter set forth in Subsection II-F. It is the express understanding and agreement of the parties that the Franchisor has retained and preserved for its own benefit the right to grant Nancy's Pizza Restaurant Franchises and the right to own and/or operate one or more Nancy's Pizza Restaurants itself at any location outside of the "exclusive area" (the term "exclusive area" being hereafter defined in Subsection II-F).

F.   For a continuous period of one hundred twenty (120) months from and after the date of execution hereof, and except as otherwise provided herein, the Franchisor shall not establish, or grant to others the right to establish, any restaurant for the purpose of using the Trademarks or the Nancy's Pizza System within the following geographic area (hereinafter referred to as the "exclusive area"): the exclusive area shall be determined and specified to the Franchisee at a later date but in no event shall the exclusive area be larger than the area within a circle which has the final restaurant location as the circle's exact center, with the radius of the circle no greater than one and one half (1 1/2) miles.

G.   Exclusive Rights Retained by the Franchisor

   1.   Special Sales.  Notwithstanding any rights granted elsewhere herein, the Franchisor retains the exclusive right to promote and conduct special sales through mobile units or temporary locations at special events such as fairs, athletic contests, conventions, etc., in the exclusive area.

   2.   Grocery Stores and Supermarkets.  Notwithstanding any rights granted elsewhere herein, the Franchisor further retains the exclusive right to sell its products to grocery stores and supermarkets for resale in the exclusive area.

   3.   Marketing Tests.   Notwithstanding any rights granted elsewhere herein, the Franchisor further retains the exclusive right to conduct marketing tests within the exclusive area in which the Franchisee may, but will not be required to, participate.

   4.   Airports, Shopping Malls, Sports Arenas, Movie Theaters and Schools.
        Notwithstanding any rights granted elsewhere herein, the Franchisor further retains the exclusive right to sell its products or grant others the right to sell its products (by means of a Nancy's Pizza Franchise, or otherwise) to restaurants and other food service businesses for resale within any airport, enclosed shopping mall, sports arena concession stands, movie theater, casino, or school (elementary, high school, college, university, or trade school) in the exclusive area.

   The Franchisee shall at all times be prohibited from engaging in any of the foregoing exclusive rights retained by the Franchisor.

III.   TERM

– 3 –

A.  Subject to the early termination provisions hereinafter set forth, the term of this Standard Franchise Agreement and the franchise herein granted, shall be for ten (10) years and shall commence on the date of execution hereof, and shall expire at midnight on the preceding day of the ten (10) year anniversary date of this Agreement.

B.  The Franchisee may at his option elect to renew the franchise granted herein for unlimited consecutive additional ten (10) year terms provided as follows:

1.  The Franchisee shall notify the Franchisor in writing of his election to renew the franchise, such written notice to be received by the Franchisor not less than sixty (60) days nor more than one hundred eighty (180) days prior to the expiration of the aforesaid initial ten (10) year term or any subsequent ten (10) year renewal term, as the case may be.

2.  The Franchisee shall, prior to the commencement of such renewal term, execute the Franchisor's then current Standard Franchise Agreement which shall set forth such renewal term and which may, without limitation, specify a different exclusive area, and/or specify greater royalties, fees and contributions than are set forth herein.

3.  The Franchisee shall execute a general release (in the form of the "General Release" attached to this Agreement as Exhibit 1) furnished by the Franchisor releasing the Franchisor, its affiliated companies, officers, directors, shareholders, employees, agents, attorneys, successors and assigns from and against any claim, debt and/or liability.

4.  The Franchisee shall not be in default of any of the terms and provisions of this Standard Franchise Agreement or any other Agreement with the Franchisor or any affiliate of the Franchisor, and the Franchisee shall have fully and faithfully complied with and performed all his obligations hereunder, inclusive of but not limited to all his monetary obligations.

5.  The Franchisee, at his sole expense, shall renovate the franchised premises (including upgrading decor, signs, and computer systems) and replace equipment so as to conform with the Franchisor's then current standards and specifications.

6.  The Franchisee shall have paid the Franchisor's then prevailing renewal fee which shall not exceed Twenty Thousand and No/100 ($20,000.00) Dollars.

7.  The Franchisee shall comply with the Franchisor's then-current training requirements, including, without limitation, training requirements specifically designed for renewing Franchisees.

8.  The Franchisee shall update the Franchisor with all missing, if any, financial reports.

C.  The foregoing notwithstanding, in the event the Franchisee's leasehold term (as it may be extended from time to time) for the franchised premises shall be less than ten (10) years

– 4 –

during the initial ten (10) year term or less than any subsequent ten (10) year renewal term of this Agreement, the expiration date of the initial term or the renewal term, as the case may be, shall be accelerated to coincide with the expiration of the Franchisee's leasehold term without any reimbursement of any fees by the Franchisor.

## IV. ROYALTIES AND OTHER FEES AND CONTRIBUTIONS

A.  Upon Franchisor fulfilling all initial obligations under this Agreement or other agreements and the commencement of doing business by Franchisee, the Franchisee shall pay the Franchisor an initial franchise fee in the amount of Thirty Thousand and 00/100 Dollars ($30,000.00) which sum shall be non-refundable and fully earned by the Franchisor upon its execution and delivery hereof, notwithstanding that the location of the franchised premises may not yet have been determined (or consented to by the Franchisor).

B.  The foregoing Subsection IV A and other provisions in this Agreement to the contrary notwithstanding, in the event that a location for the franchised premises which shall be mutually acceptable to the Franchisee and the Franchisor shall not have been determined and a lease signed (or real estate otherwise acquired) by the Franchisee within one (1) year from and after the date of execution hereof, the Franchisor within its sole and unlimited discretion, shall thereupon have the unilateral right (but not any obligation) to terminate this Agreement upon written notice to the Franchisee. Upon such termination, the Franchisee shall execute and deliver to the Franchisor a general release (in the form of the "General Release" attached to this Agreement as Exhibit 1) furnished by the Franchisor releasing the Franchisor, its affiliated companies, officers, directors, shareholders, employees, agents, attorneys, successors and assigns from and against any claim, debt and/or liability. Upon the Franchisor's receipt of the executed general release, the Franchisor may, in the Franchisor's sole and unlimited discretion, refund (but the Franchisor shall not be obligated to refund) to the Franchisee the initial $30,000.00 franchise fee hereinabove set forth in Subsection IV A less such amounts as shall be determined by the Franchisor, within its sole though reasonable discretion, that are sufficient to reimburse the Franchisor for all of its expenses (inclusive of but not limited to all brokerage expenses) in connection with the Franchisee, this Agreement, and for opportunities lost during the abbreviated term hereof. Such deducted amounts shall be fully earned by the Franchisor and shall not be refundable in whole or in part.

C.  The foregoing Subsection IV A and other provisions in this Agreement to the contrary notwithstanding, in the event the Franchisee or any of his managers shall fail to satisfactorily complete any initial courses of instruction prior to the commencement of the Franchisee's business operation as hereinafter required pursuant to Subsection V H (the determination as to whether the Franchisee shall have satisfactorily completed any such courses of instruction being within the Franchisor's sole though reasonable discretion), the Franchisor, within its sole and unlimited discretion, shall thereupon have the unilateral right (but not any obligation) to terminate this Agreement upon written notice to the Franchisee. Upon such termination, the Franchisee shall execute and deliver to the Franchisor a general release (in the form of the "General Release" attached to this Agreement as Exhibit 1) furnished by the Franchisor releasing the Franchisor, its affiliated companies, officers, directors, shareholders, employees, agents, attorneys, successors and

– 5 –

assigns from and against any claim, debt and/or liability. Upon the Franchisor's receipt of the executed general release, the Franchisor may, in the Franchisor's sole and unlimited discretion, refund (but the Franchisor shall not be obligated to refund) to the Franchisee the initial $30,000.00 franchise fee hereinabove set forth in Subsection IV A less such amounts as shall be determined by the Franchisor, within its sole though reasonable discretion, that are sufficient to reimburse the Franchisor for all of its expenses in connection with the Franchisee, this Agreement, and for opportunities lost during the abbreviated term hereof. Such deducted amounts shall be fully earned by the Franchisor and shall not be refundable in whole or in part.

D.    During the entire term hereof and all extensions thereto, the Franchisee shall also pay the Franchisor a continuing and non-refundable royalty in an amount equal to six percent (6%) of the Franchisee's gross sales (as hereinafter defined), such royalty to be computed, due and payable on a weekly basis as hereinafter designated.

E.    During the entire term hereof and all extensions thereto, the Franchisee shall also pay the Franchisor a continuing and non-refundable advertising fee in an amount equal to three percent (3%) of the Franchisee's gross sales (as hereinafter defined), such advertising fee to be computed, due and payable on a weekly basis as hereinafter designated. All such advertising fees received by the Franchisor together with like advertising fees received by the Franchisor from its other Franchisees shall be deposited into a dedicated "Advertising Fund". The Advertising Fund shall be accounted for separately from other Franchisor funds and shall not be used to defray any Franchisor general operating expenses, except for such reasonable salaries, administrative costs and overhead as the Franchisor may incur in activities reasonably related to the administration of the Advertising Fund and its advertising programs (including, without limitation, conducting market research, preparing advertising and marketing materials, and collecting and accounting for contributions to the Advertising Fund). The Franchisor may expend in any fiscal year an amount greater or less than the aggregate contribution to the Advertising Fund in that year and the Advertising Fund may borrow from the Franchisor or other lenders to cover deficits in the Advertising Fund or cause the Advertising Fund to invest any surplus for future use by the Advertising Fund. A statement of monies collected and costs incurred by the Advertising Fund shall be prepared annually by the Franchisor and shall be furnished to the Franchisee upon written request. The determination of advertising and/or promotion for which the Advertising Fund shall be utilized shall be within the Franchisor's sole and unlimited discretion. Although the Franchisor shall endeavor to use all advertising fees deposited into the Advertising Fund for the general benefit of all Restaurants, the Franchisor shall not be obligated to expend any such advertising fees for the benefit of any specific Restaurant or for any specific geographic area; there being, therefore, no assurance that a given Restaurant or Restaurants shall benefit in proportion to its (their) advertising fee contribution.    The Franchisee acknowledges and agrees that expenditures by the Advertising Fund may not benefit the Franchisee's Restaurant directly or in proportion to the Franchisee's contribution to the Advertising Fund.

F.    No later than Sunday of each week during the entire term hereof and all extensions thereto, the Franchisee shall cause all sales information, and all other information designated by the Franchisor to the Franchisee from time to time and at any time, for the preceding

– 6 –

calendar week (Sunday through Saturday) to be retrievable by the Franchisor from the Franchisee's computer system. Such sales information and other information shall be utilized by the Franchisor to compute the Franchisee's royalty and advertising fee for the preceding calendar week. In addition to the foregoing, continuously during the entire term hereof and all extensions thereto, the Franchisee shall furnish the Franchisor with copies of the following: a then current monthly profit and loss statement, monthly balance sheet, monthly business bank account statement, all business cancelled checks, all business deposit tickets, all sales tax returns, all 941 payroll reports, all 940 payroll reports, all W-3s, W-2s, and I-9s, all business credit card statements, business general ledger, all corporate tax returns, POS monthly income reports, POS labor monthly report, POS item count monthly report, all credit card merchant reconciliation reports, and such other information as the Franchisor deems necessary to properly evaluate the progress and performance of the Franchisee.

G.   As used herein, "gross sales" shall be defined as the total dollar receipts and amounts from all sales of goods, wares, merchandise and services made from the franchised premises (and all such sales made away from the franchised premises, if such sales are made in any manner directly related to the franchise herein granted) whether made by the Franchisee or any assignee or designee of the Franchisee, or any other third party and whether made for cash or on credit. Gross sales shall not include, however, any sums collected from customers for any sales, retail occupation, or excise taxes imposed by any duly instituted governmental authority if such taxes are added to the sales price for the merchandise and services made by the Franchisee, or any assignee or designee thereof.

H.   All payments received by the Franchisor from the Franchisee for royalties and advertising fees shall be applied to the oldest obligation regardless of any contrary designation by the Franchisee.

I.   The Franchisee shall prepare and retain for not less than seven (7) years following the end of its fiscal year's adequate records, books of account and tax returns showing daily receipts, applicable sales tax returns, sales slips and cash register records, and such other sales records as may be reasonably required by the Franchisor. The Franchisor shall be entitled to an accounting from the Franchisee for all weekly obligations which it is entitled to receive hereunder and shall have the right at reasonable times to inspect the Franchisee's records, books of account and tax returns and to conduct at least once a year at the Franchisor's expense an independent audit thereof. In the event such annual audit discloses an error which reflects that gross sales originally reported were understated by more than two percent (2%), the Franchisee shall bear the cost of such audit. The Franchisor shall be and is hereby permitted to make copies of and/or remove any such records, books of account and/or tax returns from the franchised premises for purposes of any such inspection. Any such copying shall be at the Franchisor's expense, and if any of such records, books of accounts and/or tax returns are removed from the franchised premises by the Franchisor, they shall be returned by the Franchisor within a reasonable period of time. All information furnished under this Subsection IV by the Franchisee shall be kept in confidence by the Franchisor to the extent such information is not required to be divulged under proper legal process.

J.     Upon the termination of this Agreement for any reason, including the expiration of its term, the Franchisee shall pay to the Franchisor such weekly royalty and advertising fee or portion thereof, and all other sums as are due and unpaid promptly upon request of the Franchisor.

K.     Continuously during the entire term of this Agreement and all extensions thereto, the Franchisee shall execute all necessary forms and complete the reasonable procedures of the Franchisor to establish a bank draft arrangement whereby (1) the Franchisor will be able to present (electronically or otherwise, at the Franchisor's discretion) a draft for the weekly royalty and the weekly advertising fee, and for any other amounts which may be due and payable by the Franchisee to the Franchisor pursuant to this Agreement and/or any other agreement between the parties, to the bank or other financial institution used by the Franchisee; and (2) the Franchisor will be able to withdraw (electronically or otherwise, at the Franchisor's discretion) the weekly royalty and the weekly advertising fee (and any other amounts which may be due and payable by the Franchisee to the Franchisor pursuant to this Agreement and/or any other agreement between the parties) from the Franchisee's account for credit to an account or accounts designated by the Franchisor. The Franchisee shall at all times have sufficient funds in its account for the bank draft to be honored by its bank or other financial institution, and shall advise the Franchisor in advance of any change in its bank, financial institution or account.

L.     Continuously during the entire term hereof and all extensions thereto, the Franchisee shall pay to the Franchisor the following:

   1.     A service charge equal to One Percent (1%) of the Franchisee's previous week's gross sales each time the information hereinabove set forth in Subsection IV F shall not have been retrievable by the Franchisor in a timely manner (except as a result of the failure of the Franchisor's computer system);

   2.     A service charge in the amount of Forty-Five and No/100 Dollars ($45.00) each time any Franchisee payment is not honored due to insufficient funds, or uncollected funds, or stopped payment; and

   3.     Interest accruing on any royalty, and/or advertising fee, and/or other amount due and payable to the Franchisor which shall not be received by the Franchisor within ten (10) days from and after the date it shall be due and payable, at the rate of (.05%) per day, or the highest rate permitted by law, whichever is less. Any such accrued interest, if any, shall be due and payable by the Franchisee with the then next successive weekly royalty and advertising fee payment.

   All of the foregoing service charges and interest are in addition to and not in lieu of any other rights and remedies the Franchisor possesses pursuant to this Agreement.

M.     In the event the Franchisor, in its sole and unlimited discretion, shall permit the Franchisee to locate an automatic teller machine ("ATM") on the franchised premises, the Franchisee shall pay the Franchisor the sum of One Dollar ($1.00) for each and every transaction conducted through the ATM.

N.  In addition to the non-refundable advertising fee, Franchisee will expend, at a minimum, an amount equal to 4.0% of Franchisee's gross sales (as hereinafter defined) on a monthly basis for local advertising and promotion for the term of this Agreement. These amounts will be paid directly to the service provider and not the Franchisor. Within 30 days after the end of each month, you must send us, in the manner we prescribe, an accounting for your expenditures for local advertising and promotion during the preceding month.

V.  OPERATIONS AND STANDARDS OF QUALITY

A.  The Franchisee (and if the Franchisee is a corporation or other business entity, the Franchisee's shareholder(s) or owner(s)) shall continuously operate on a full-time basis (during such hours as shall be determined by the Franchisor at its sole discretion) and diligently develop the Restaurant, offering only such goods and services as are authorized from time to time by the Franchisor in writing. The franchised business must at all times be under the direct, on premises supervision of the Franchisee, or such person who has been approved in writing by the Franchisor, who must devote his full time and energy to the operation of the franchised business. The Franchisor may require that the Franchisee hire at least one (1) full time manager in addition to the Franchisee's own full time services (if the Franchisee is an individual) or the full-time services of the person who owns and/or controls the majority or largest interest in the Restaurant (if the Franchisee is a corporation or other business entity). The Franchisee (and if the Franchisee is a corporation or other business entity, the Franchisee's shareholder(s) or owner(s)) shall not, during the term of this Agreement and all extensions thereto, engage in the operation of (as an owner, shareholder, director, officer, partner, employee, member, agent, consultant or other similar capacity) or have a material financial interest in any restaurant or food service business (i.e., by contributing directly or indirectly more than ten percent [10%] of the total capital) any restaurant business similar to that franchised hereunder (to wit: any restaurant or food service business whose annual gross sales from the sales of pizza and pasta [net of sales tax] shall account for fifteen percent [15%] or more of the total annual sales for such restaurant or food service business) without the express written consent of the Franchisor which may be withheld at the Franchisor's sole and unlimited discretion. The Franchisee acknowledges and warrants that no such violation of the terms of this Subsection V A exists as of the date of this Agreement.

B.  The Franchisor shall upon the full execution hereof and from time to time and at any time during the term hereof and any extensions thereto furnish to the Franchisee the then current quantitative and qualitative standards and specifications applicable to any inventory, supplies, menus, equipment, and other products and services required by the Franchisor to be utilized in the establishment and operation of the Restaurant (provided that the Franchisor shall not be obligated to disclose any of its trade secrets). The Franchisee shall at all times absolutely comply with and adhere to such current standards and specifications notwithstanding that the Franchisee shall have obtained any of the foregoing from a source which shall not have been approved by the Franchisor (pursuant to Subsection V C). The Franchisor shall not be arbitrary or capricious in establishing its standards and specifications.

C.  The Franchisee shall purchase all inventory, supplies, menus, equipment, and other products and services required by the Franchisor to be utilized in the establishment and operation of the Restaurant only from sources approved by the Franchisor in writing. The Franchisor shall promptly (and in any event within 30 days) furnish to the Franchisee at the Franchisee's request the names and addresses of all manufacturers and suppliers currently approved by the Franchisor from whom such inventory, supplies, menus, equipment, and other products and services are available to the Franchisee. The Franchisor shall not be required to approve sources of inventory, supplies, menus, equipment, or other products and services which do not meet the Franchisor's standards and specifications. If the Franchisee desires the Franchisor to approve a manufacturer or supplier not then approved by the Franchisor, the Franchisee shall provide the Franchisor with such information regarding such manufacturer or supplier as shall be reasonably requested by the Franchisor and, where appropriate, the manufacturer or supplier may be required to provide the Franchisor with evidence pertaining to prior services rendered and samples of the products that the Franchisee desires to purchase. Any tests reasonably required by the Franchisor to determine whether the services and/or products meet current standards and specifications shall be performed by or under the direction or supervision of the Franchisor but at the cost of the manufacturer or supplier. On the completion of any tests and any other procedures reasonably required by the Franchisor, and on completion of the Franchisor's determination as to whether the manufacturer or supplier possesses adequate capacity and facilities to supply the Franchisee's needs in the quantities, at the times and with the reliability requisite to an efficient operation, the Franchisor shall promptly notify the Franchisee and the manufacturer or supplier whether the Franchisor approves the manufacturer or supplier, as a source of supply; and, if not, the Franchisor shall advise the Franchisee and the manufacturer or supplier of the basis for its decision. The Franchisor may from time to time review the quality of the services and/or products supplied by approved manufacturers and suppliers and their capacities and facilities. On the basis of such review, the Franchisor may remove such manufacturers or suppliers from the list of approved sources. In such event, the Franchisor shall promptly advise the Franchisee of such action. The Franchisor may charge a fee not to exceed Five Thousand and No/100 Dollars ($5,000.00) to the proposed manufacturer or supplier in advance of any evaluation of a proposed manufacturer or supplier. The foregoing notwithstanding, you are currently required to purchase or lease, as the case may be, the following equipment, supplies, products or services from the sources indicated:

1.  Computer hardware and software: Speedline Solutions, Inc. of Lynden, Washington;

2.  Credit card processing, credit card processing equipment fee, and gift card program: Mercury Payment Systems of Durango, Colorado;

3.  Secret "spice and seasoning packages" and sausages: Greco and Sons of Bartlett, Illinois; Greco and Sons of Phoenix, Arizona; or SOFO of Suwanee, Georgia;

4.  Architectural services: Barker Nestor Architecture and Design of Chicago, Illinois;

5.  Construction company: Industry Innovations, Inc. of Elgin, Illinois; Premier

– 10 –

Restaurant Solutions, Chicago, Illinois, or such other construction company approved by the Franchisor (at the Franchisor's discretion);

6. Online ordering: QuikOrder of Chicago, Illinois;

7. Insurance: Farmers Insurance Group exclusively through Candos Insurance Agency of Palos Park, Illinois.

8. Accounting services: George S. Smith, Inc. of Orland Park, Illinois; and

9. Restaurant equipment: Boelter, Chicago Foodservice Design, Equipment & Supply of Wood Dale, Illinois.

10. Interior design: Sheri Law Ltd. of Homer Glen, Illinois.

11. Grand opening and advertising: Praytrell Strategy of Brooklyn, New York.

D. The Franchisee shall keep on display at all times in a prominent location upon the franchised premises in full view of customers a plaque provided by the Franchisor which shall indicate that the Restaurant is owned by the Franchisee and operated under a Franchise Agreement with the Franchisor, and at the Franchisor's discretion that franchises are available from the Franchisor with information pertaining thereto.

E. The Franchisee, at the Franchisee's sole expense, shall purchase, install and/or construct all equipment and/or improvements specified in the Franchisor's standard plans and specifications, and such other improvements as the Franchisor may reasonably direct from time to time in the Franchisor's Confidential Operating Manual or otherwise in writing; and the Franchisee shall refrain from installing and/or constructing or permitting to be installed and/or constructed on or about the franchised premises, without the Franchisor's prior written consent, any improvements pertaining to the Restaurant not previously approved as meeting the Franchisor's standards and specifications.

F. The Franchisee shall at all times maintain the franchised premises and all equipment and facilities in such a manner as required by appropriate laws and regulations and by the Franchisor's standards and specifications and shall at his sole expense obtain all applicable permits and licenses.

G. In order to protect the Franchisor's reputation and good will and to maintain uniform standards of operation thereunder, the Franchisee shall conduct the Restaurant using the Trademarks and the Nancy's Pizza System in strict compliance with the Franchisor's courses of instruction, periodic directives and Confidential Operating Manual.

1. The Franchisee shall at all times treat as confidential, and shall not at any time copy, duplicate, record, or otherwise reproduce, in whole or in part, or otherwise make available to any unauthorized person or source, said Manual.

2. The Confidential Operating Manual shall at all times remain the sole property of

– 11 –

the Franchisor and shall promptly be returned upon the expiration or other termination of this Standard Franchise Agreement.

3.   In order for the Franchisee to benefit from the Franchisor's knowledge of new developments in products, accessories, marketing and operating techniques, the Franchisor may from time to time revise the content of said Manual.

In order to insure compliance with the Confidential Operating Manual and this Agreement, representatives of the Franchisor may, at any reasonable time, enter into and inspect the franchised premises.

H.   The Franchisee, and all of his managers, successors and assigns, shall prior to assuming the day to day operations of the Restaurant complete any regular course of instruction offered by the Franchisor, unless because of previous experience the Franchisee shall be relieved of the foregoing requirement by the Franchisor in writing. The Franchisor shall not provide any payments to nor shall the Franchisor defray any living expenses of the Franchisee or his managers during or in connection with such initial course of instruction or during any subsequent course of instruction, all such expenses being the sole obligation of the Franchisee. The Franchisee and his managers shall in addition to the foregoing undertake and complete any continuing training programs which may be offered from time to time by the Franchisor, in order to implement current operational standards for which the Franchisor shall not pay any expenses. The Franchisee and his managers shall also successfully complete the annual recertification program offered by the Franchisor.

I.   The Franchisee shall pay the Franchisee's pro rata share of the cost of telephone directory advertising (which advertising shall be determined by the Franchisor) in municipalities with more than one Nancy's Pizza Restaurant or municipalities using the same telephone directory, which costs shall be apportioned by the Franchisor equally among all the Nancy's Pizza Restaurants listed in such advertising. If the Franchisee's Restaurant shall be the only Nancy's Pizza Restaurant in a municipality, the Franchisee shall pay the entire cost of such telephone directory advertising.

J.   In addition to and not in lieu of advertising provided by the Franchisor, the Franchisee shall from time to time participate in any local or regional "cooperative" advertising and/or promotional campaigns which shall be approved in advance by the Franchisor and which are subscribed to by a simple majority of other Nancy's Pizza Restaurants located within the market coverage area(s) designated by the Franchisor which shall include the franchised premises. In such event the Franchisee shall pay a proportional part of the cost and expense of such advertising and/or promotional campaigns based upon either a flat rate per Restaurant, or, alternatively, the ratio that the Franchisee's gross sales from the Restaurant bears to the gross sales generated by all participating Nancy's Pizza Restaurants in such market coverage area(s) for the period of the given advertising and/or promotional campaign. The Franchisee shall not be permitted to use its own advertising materials without the express written consent of the Franchisor, which consent may be withheld in the Franchisor's sole and unlimited discretion.

K.   The Franchisee is and shall at all times remain an independent contractor and shall not

– 12 –

make any representations or take any action which might establish any apparent relationship of agency, joint venture, partnership or employment with the Franchisor and the Franchisor shall not be obligated in any manner by any agreements, warranties or representations made by the Franchisee to third persons. Subject to the provisions of Subsection V A hereof, the Franchisee shall at all times be solely responsible for all hiring and security decisions at his Nancy's Pizza Restaurant.

L.    At the time the Franchisee executes the lease for the franchised premises (or at the time the Franchisee otherwise acquires the franchised premises, as the case may be), the Franchisee shall also sign a Standard Lease Option Agreement, a copy of which is attached hereto made a part hereof as Exhibit 2. The Franchisee shall be prohibited from commencing construction and/or renovation of the franchised premises until the Franchisor shall have been provided with a fully executed Standard Lease Option Agreement together with the Franchisee's lease and other documents required pursuant to the Standard Lease Option Agreement.

M.    At no time during the term hereof or during any extensions thereto, shall the Franchisee, directly or indirectly, employ or seek to employ any person who is or shall be employed by the Franchisor or any other Nancy's Pizza Restaurant Franchisee.

N.    The Franchisor, at its sole and unlimited option, may at any time upon written notice to the Franchisee, require that all right, title and interest in and to all telephone and facsimile machine numbers used in and in connection with the Restaurant be in the sole name of the Franchisor (or the Franchisor's designee). In such event, (a) the Franchisee shall execute all documents and instruments reasonably required by the Franchisor and the applicable telephone company or companies to evidence the Franchisor's (or the Franchisor's designee's) interest in such numbers; and (b) the Franchisor (or the Franchisor's designee) shall periodically (no less frequently than monthly) bill the Franchisee for all such telephone and facsimile machine charges; provided, however, all such charges shall be at the same rates incurred by the Franchisor (or the Franchisor's designee). The Franchisee's failure to fully pay any such charges (within ten [10] days after the Franchisee's receipt of a statement for such charges) shall be a material default pursuant to this Agreement. The foregoing notwithstanding, the Franchisee may, at the Franchisee's reasonable discretion, determine and direct the Franchisor in writing as to which local and long distance providers shall be utilized for such telephone and facsimile machine numbers. Upon the expiration or termination of this Agreement, the Franchisor may, at its sole and unlimited discretion, and without prior notice to the Franchisee, cause all such telephone and facsimile machine number service to and for the Restaurant to be permanently discontinued, or, alternatively, assigned to the Franchisor; and the Franchisor may thereafter from time to time and at any time at its sole and unlimited discretion continue to utilize any such telephone and facsimile machine numbers for any purpose whatsoever.

O.    The Franchisor shall at all times during and after the term of this Agreement have unlimited rights to use the customer data base information contained in the Franchisee's computer hardware and software system for whatever purpose or purposes the Franchisor deems necessary or advisable, including, but not limited to, marketing and sales, surveys, and research, which may or may not include the Franchisee's Restaurant. The Franchisor shall

– 13 –

also during the entire term hereof and all extensions thereto have full and unlimited access to the Franchisee's computer system including but not limited to access to all functions, and data relating to reporting, sales, product mix, inventory, labor information, pricing, quick counts, and voids. The Franchisee is prohibited from deleting or restricting the Franchisor's unlimited access to any of the foregoing functions and data, without, in each instance, the express written consent of the Franchisor, which consent may be withheld in the Franchisor's sole and unlimited discretion.

P.    At no time during the term hereof or during any extensions thereto, shall the Franchisee, directly or indirectly, create, develop or set up a website offering Chicago Franchise Systems' products, nor shall the Franchisee operate or maintain any e-commerce business selling Chicago Franchise Systems' products. The Franchisee is prohibited from using the Trademarks or any element of the Nancy's Pizza System on any website. The term "website" shall be and hereby is defined as an interactive electronic document contained in a network of computers linked by communications software, and shall include the Internet and World Wide Web home pages.

Q.    Continuously during the entire term hereof and all extensions thereto, the Franchisee shall be and is hereby prohibited from permitting any lottery machines, slot machines, gaming machines, vending machines or devices to be placed upon the franchised premises.

R.    Continuously during the entire term hereof and all extensions thereto, the Franchisee shall be and is hereby prohibited from shipping any of the Restaurant's products anywhere in the world.

S.    Continuously during the entire term hereof and all extensions thereto, the Franchisee shall have his computer system connected to the Internet via DSL (high speed) Internet service connection with a permanent Internet protocol address (static IP address) twenty-four (24) hours per day (5 static IP addresses are needed.) In the event DSL (high speed) Internet service is not available in the Franchisee's area, the Franchisee shall be required to install a dedicated telephone line for Internet connection, and the Franchisee shall also be required to convert to DSL service at his own expense at such time as DSL service shall become available. The Franchisee is also required to purchase an annual computer maintenance support contract reasonably acceptable to the Franchisor.

T.    Continuously during the entire term hereof and all extensions thereto, the Franchisee shall only hire employees fluent in English for all positions requiring contact with customers either by telephone or in person.

U.    In the event the Franchisor shall (in its sole and unlimited discretion) permit the Franchisee to provide outside catering services, such outside catering services shall be subject to the Franchisor's rules and regulations. The Franchisor may (in its sole and unlimited discretion) limit any such outside catering services to the Franchisee's exclusive area and/or to any other specific geographic area.

V.    From time to time and at any time, the Franchisor may, upon written notice to the Franchisee, and at the Franchisor's sole and unlimited discretion, establish minimum and/or

– 14 –

maximum retail prices for any products and/or services sold or offered for sale by the Franchisee. Except to the extent that the Franchisor may set any such retail prices, the Franchisee shall not be restricted regarding the retail pricing of any such products and/or services.

W.   During the entire term hereof and all extensions thereto, the Franchisee will fully and timely comply with all laws, rules and regulations, including, but not limited to all local, state and federal taxation, health, sanitation, building and menu labeling laws.

X.   The Franchisor may from time to time, at the Franchisor's sole and unlimited discretion, do any one or more of the following:

    (i)   make available for the Franchisee's purchase various items of inventory, supplies (including printed materials and uniforms), equipment and services for use in the Restaurant upon which the Franchisor may realize a profit;

    (ii)   sell spices and/or other ingredients to certain approved suppliers upon which sales the Franchisor may realize a profit. Such spices and/or other ingredients, in turn, may be sold to the Franchisee directly by the supplier or suppliers for use at the Restaurant, or such spices and/or other ingredients may be used in the preparation of food products which, in turn, shall be sold to the Franchisee by the supplier or suppliers for use in the Restaurant;

    (iii)   receive periodic rebates from certain approved suppliers based upon purchases from those suppliers by the Franchisor's franchisees, any such rebates being retained by the Franchisor and being the Franchisor's sole property;

    (iv)   receive periodic payments from certain approved suppliers which will, in turn, be used exclusively by the Franchisor for advertising and promotional purposes, and which may, at the Franchisor's sole and unlimited discretion, be deposited into the Advertising Fund;

    (v)   receive fees from certain approved suppliers for administrative, technical, account guarantee and inspection services, any such fees being retained by the Franchisor and being the Franchisor's sole property; and

    (vi)   receive sublease payments from the Franchisee in an amount greater than the amount the Franchisor is required to pay the Landlord under the Prime Lease, any such excess payments being retained by the Franchisor and being the Franchisor's sole property.

VI.   OPERATING ASSISTANCE

In addition to assistance rendered by the Franchisor as hereinabove specified, the Franchisor shall:

A.   Furnish the Franchisee with initial floor plans and specifications (but not formal

– 15 –

architectural plans) for a Nancy's Pizza Restaurant premises, equipment, furnishings, decor, layout and exterior and interior signage, together with advice and consultation concerning the foregoing as they relate to the franchised premises. Any modification for non-standard facilities, whether required by virtue of local zoning or building laws, reduced or increased space availability, or otherwise are subject to the prior written approval of the Franchisor and shall be paid for by the Franchisee.

B.     Furnish the Franchisee with a copy of the Franchisor's Confidential Operating Manual, and shall from time to time furnish the Franchisee with modifications and additions thereto.

C.     Furnish operation commencement assistance and counseling to the Franchisee at the franchised premises by means of a "Restaurant opening team" comprised of an operations supervisor and at least one assistant.

D.     Furnish the Franchisee such operating advice and training at the Franchisor's offices or otherwise on a continuing basis through its representatives as the Franchisor deems necessary or appropriate.

E.     Provide purchasing guidance for inventory, supplies, menus, materials, equipment and services used in connection with the Restaurant.

F.     Undertake further refinement of its operational techniques and equipment and inform the Franchisee thereof.

G.     Inform the Franchisee of such research and development which in the Franchisor's opinion may be beneficial to the Franchisee's operations.

H.     Recommend such accounting and business procedures which the Franchisor believes may be of value to the Franchisee.

I.     Schedule and hold from time to time meetings and seminars for the advancement and dissemination of its operational methods and techniques, attendance at which by the Franchisee (at the Franchisee's sole expense) shall be mandatory.

VII.     TRADEMARKS AND TRADE SECRETS

A.     The Franchisee acknowledges the Franchisor's ownership of and/or rights to use, grant licenses and franchises for the use of the current and future Trademarks and all related practices, procedures, methods, devices and techniques, and the Franchisee shall not at any time in any manner contest the validity of the Franchisor's ownership of and/or rights to the same whether now existent or hereafter obtained. The Franchisee further acknowledges that all good will relating to the Trademarks and the Nancy's Pizza System shall inure to the benefit of the Franchisor.

B.     The Franchisee acknowledges that he has had no part in the creation or development of, no prior knowledge of, and no property or other rights or claims in or to, any element of the Nancy's Pizza System or the Trademarks, and agrees that all materials loaned or otherwise

– 16 –

made available to the Franchisee and all disclosures made to the Franchisee by or at the direction of the Franchisor, and not to the general public, at any time before or during the term of this Agreement and any extension thereto, or communicated and made available shall hereafter be kept confidential as trade secrets. The Franchisee shall not, during the term of this Agreement and any extension thereto, disclose, exhibit or reproduce to any corporation, association, partnership, business entity or person, other than to those persons in the employ of the Franchisee to whom disclosure must be made to enable the Franchisee to operate the Restaurant under the terms of this Agreement, any confidential element of the Nancy's Pizza System or any other confidential information or trade secrets which are in any way whatsoever connected with the Nancy's Pizza System or the franchise rights granted hereunder, and which may become known to the Franchisee either through or at the direction of the Franchisor or in any other manner whatsoever. After the termination of this Agreement neither the Franchisee, nor any of the Franchisee's employees, nor any of the Franchisee's officers, directors, shareholders, partners, members or agents, if the Franchisee is a corporation or other business entity, shall disclose, exhibit or reproduce any such confidential element of the Nancy's Pizza System or any other confidential information or trade secrets to any corporation, association, partnership, business entity or person whatsoever. The Franchisee acknowledges that all of the foregoing are trade secrets in which the Franchisor has made a substantial investment and has a legitimate right to protect against unlawful or unauthorized disclosure.

C.   The Franchisee shall only use the existing or future Trademarks and related practices, systems, procedures, methods, devices and techniques and variations thereof as are applicable to the Restaurant and in conformity with the provisions of this Agreement, and such use by the Franchisee shall inure to the benefit of the Franchisor.

D.   The Franchisee shall not advertise the Trademarks or use the Trademarks in advertising or any other form of promotion (including but not limited to the use of the Trademarks on T-shirts, hats, and other garments, beverage containers, and the like) except as may be approved in writing in advance by the Franchisor, such approval not to be unreasonably withheld by the Franchisor; provided, however, the Franchisor may withhold approval for the Franchisee to directly affix the Trademarks to products or to contract for products bearing the Trademarks (such products being inclusive of but not limited to T-shirts, hats, and other garments, beverage containers, and the like) if such products shall already be available for purchase by the Franchisee from one or more suppliers approved by the Franchisor in accordance with the terms of this Agreement.

E.   When using the Trademarks, the Franchisee shall cause same to be utilized and/or reproduced as the case may be exactly and accurately and, when applicable (and only when applicable) or required by the Franchisor, shall mark all advertising with the encircled letter "R" so as to protect the Franchisor's rights.

F.   The Franchisee shall not use the Trademarks in his own trade or corporate name and shall not use his own name or any other name in connection with said Trademarks, unless the Franchisor's prior written approval is obtained.

G.   The Franchisee shall immediately inform the Franchisor of any suspected or known

– 17 –

infringement of or challenge to the Trademarks and/or the Nancy's Pizza System by others and assist and cooperate with the Franchisor in taking such action at the Franchisor's own expense as the Franchisor deems appropriate.

H.    If it becomes necessary or advisable at any time in the Franchisor's sole discretion for the Franchisor and/or the Franchisee to modify or discontinue the use of any of the Trademarks, and/or use one or more additional or substitute Trademarks, the Franchisee shall comply with the Franchisor's directions to modify or otherwise discontinue use of such Trademarks, and/or use of one or more additional or substitute Trademarks, as the case may be, within a reasonable period of time after notice thereof from the Franchisor. The Franchisor shall not compensate the Franchisee for any costs whatsoever incurred by the Franchisee in connection with any such modification or discontinuance.

I.    Upon the expiration or termination of this Agreement for any reason, the Franchisee shall take such action as shall be necessary to cancel any assumed name or equivalent registration which contains any of the Trademarks and the Franchisee shall furnish the Franchisor evidence satisfactory to the Franchisor of compliance with this obligation within thirty (30) days after such expiration or termination.

## VIII.  ASSIGNMENT, TRANSFER AND SALE

A.    The Franchisee acknowledges that the granting of the franchise rights hereunder was based upon the Franchisor's investigation into the Franchisee's qualifications, and the Franchisee therefore agrees that it shall not assign, transfer, sell or otherwise dispose of this Agreement, or any of the franchise rights or privileges granted hereby, or any rights or privileges incidental thereto (this Agreement, the rights and privileges granted hereby, and any rights and privileges incidental thereto being hereinafter sometimes collectively referred to as the "Rights"), to any person, firm or corporation, other than by an assignment, transfer and/or sale of this Agreement and all of the other Rights to a corporation (or other business entity reasonably acceptable to the Franchisor) in which the Franchisee (collectively if more than one) owns and holds beneficially and of record and shall continue to own and hold throughout the term of this Standard Franchise Agreement and all extensions thereto no less than one hundred percent (100%) of the issued and outstanding capital stock (or ownership interest in the case of a business entity other than a corporation) and no less than one hundred percent (100%) of the voting power of such a corporation (or other business entity), unless this Agreement and all other Rights are first offered in writing to the Franchisor, its successors, assigns or designees upon the same terms and conditions and for the same or like consideration recited in any bona fide written offer received by the Franchisee.

    1.    The Franchisor shall have thirty (30) calendar days following receipt of said written offer from the Franchisee within which to accept such offer.

    2.    If the Franchisor rejects such offer, the Franchisee shall still not assign, transfer, sell or otherwise dispose of this Agreement and/or any of the other Rights without first providing the Franchisor with such information concerning the proposed assignee, transferee, or purchaser as the Franchisor may reasonably request and

– 18 –

obtaining the express written consent of the Franchisor, which shall not be unreasonably withheld if the proposed assignee, transferee, or purchaser is not a competitor of the Franchisor or its affiliates, agrees to devote adequate time and effort to the operation of the Restaurant, agrees, at his expense, and upon such other terms and conditions as the Franchisor may reasonably require, that he and his managers shall complete the training program then in effect for new Franchisees to the satisfaction of the Franchisor, is in the Franchisor's reasonable judgment financially responsible and of good character and repute, pays to the Franchisor the then current transfer fee charged for administering such transfers and, if required by the Franchisor, executes a Standard Franchise Agreement generally used by the Franchisor at the time of its consent. The term of such new Standard Franchise Agreement may, at the Franchisor's sole and unlimited option, be for a full ten (10) years or for a lesser period of time corresponding to the term remaining in the Franchisee's Standard Franchise Agreement as at the date of the transfer. Prior to any such assignment, transfer, or sale the Franchisee must be in full compliance with all of the terms and provisions of this Agreement, and all other Agreements with the Franchisor, if any, and the Franchisee must execute a general release (in the form of the "General Release" attached to this Agreement as Exhibit 3) furnished by the Franchisor releasing the Franchisor, its affiliated companies, officers, directors, shareholders, employees, agents, attorneys, successors and assigns from and against any claim, debt and/or liability.

B.      If a corporation (or other business entity reasonably acceptable to the Franchisor) in which the Franchisee beneficially and of record owns and holds and is to continue to own and hold throughout the term of this Standard Franchise Agreement no less than one hundred percent (100%) of the issued and outstanding capital stock (or ownership interest in the case of a business entity other than a corporation) and no less than one hundred percent (100%) of the voting power of such a corporation (or other business entity) is to acquire any of the Rights (by assignment, transfer, sale, or any other disposition),then prior to such acquisition an appropriate resolution shall be duly adopted by such corporation (or other business entity) acknowledging the foregoing requirement of ownership and regulating the issuance, assignment, transfer, sale or other disposition of the voting stock (or ownership interest in the case of a business entity other than a corporation) accordingly, and the contents of such resolution shall be reflected in the corporate (or other entity) records and noted conspicuously on all voting stock certificates (or other indicia of ownership) issued by the corporation (or other business entity).

1.      At least thirty (30) days prior to said acquisition, the Franchisor shall be notified in writing of same and immediately following said acquisition, the Franchisor shall be furnished with a duly attested copy of said resolution.

2.      None of the capital stock, or securities (or ownership interest in the case of a business entity other than a corporation) convertible into capital stock (or other ownership interest) of said corporation (or other business entity) shall be the subject of any public offering without the prior written consent of the Franchisor, which consent will not be unreasonably withheld.

C.     If the Franchisee is an individual and later assigns, transfers, sells, or otherwise disposes of any of the Rights to a corporation (or other business entity reasonably acceptable to the Franchisor) in accordance with the terms of this Section VIII, such individual Franchisee agrees to first execute such instruments, including joint and several personal guarantees (in the form of the "Guarantee" attached to this Agreement as Exhibit 4) of the obligations of the corporation or corporations (or other business entity) to which the Rights are assigned, transferred, sold, or otherwise disposed, as may be from time to time requested by the Franchisor.

D.     This Agreement and all of the other Rights shall be immediately terminable, at the option of the Franchisor, if this Agreement or any of the other Rights is/are owned or controlled by a corporation (or other business entity reasonably acceptable to the Franchisor) in which the Franchisee, if an individual, does not own and hold beneficially and of record one hundred percent (100%) of the issued and outstanding capital stock (or ownership interest in the case of a business entity other than a corporation) and one hundred percent (100%) of the voting power of such a corporation (or other business entity).

E.     The Franchisor shall have the right to assign this Agreement or any and all rights hereunder at any time to any parent, affiliate, subsidiary or division of the Franchisor or to any successor to the business of Franchisor or any other person or corporation and the benefit of this Agreement shall inure to such assignee, provided the Franchisee shall continue to remain fully liable to the Franchisor hereunder.

F.     The Franchisee shall not without the prior written consent of the Franchisor place in, on or upon the franchised premises or in any communication media any form of advertising relating to the sale of the franchised business or this Agreement or any of the other Rights.

G.     Upon the death or incapacity of the Franchisee, if the Franchisee is not a corporation or other acceptable business entity, the rights granted under this Agreement may be transferable to the heirs or personal representatives of the Franchisee, provided arrangements have been made satisfactory to the Franchisor for the continued active management of the franchised business in a manner which fully and completely complies with all of the terms of this Agreement. Upon the death or incapacity of any stockholder, if the Franchisee is incorporated (or upon the death or incapacity of any owner(s), if the Franchisee is another acceptable business entity), this Agreement will continue in effect provided the ownership and active management of the franchised business continues in a manner acceptable to the Franchisor, and which fully and completely complies with all of the terms of this Agreement.

H.     The Franchisee shall at no time permit a pledge, hypothecation or encumbrance of this Agreement or any of the other Rights, without the prior written consent of the Franchisor, which consent may be withheld at the Franchisor's sole and unlimited discretion.

IX.    INSURANCE AND INDEMNIFICATION

A.     No later than fifteen (15) days prior to the commencement of construction upon the franchised premises and at all times during the effective term of this Agreement and all

– 20 –

extensions thereto, the Franchisee shall at his expense by advance payment of premium procure and maintain in force and effect insurance coverage, the terms of which shall be satisfactory to the Franchisor and shall be, unless modified by the Franchisor in writing because of extenuating circumstances, in at least the following amounts:

<u>Insurance Coverages</u>:                                               <u>Minimum Required Limits</u>:

Fire, extended coverage, vandalism,                           100% of the full replacement and malicious mischief cost of the Restaurant building (or leasehold improvements), appurtenances, equipment, inventory and supplies

| | |
|---|---|
| Contents........................................................................ | $ Replacement Value |
| Tenants/Improvements/Betterments........................ | $ Replacement Value |
| Computers and Data.................................................... | $20,000 - $25,000 |
| Business Income.......................................................... | Actual Sustained Loss - 18 months |
| Equipment Breakdown............................................. | Included - Full Value |
| Spoilage........................................................................ | $25,000 |
| Outdoor Signs.............................................................. | $ Replacement Value |
| Building Glass.............................................................. | $ Replacement Value |
| Covered Property - Within 1,000 feet of building.. | $ Replacement Value |
| Utility Service Time Element..................................... | Loss of Income $10,000 |
| Food Borne Illness...................................................... | Loss of Income $50,000 |

<u>Crime Coverages</u>:

| | |
|---|---|
| Employee Dishonesty.................................................. | $10,000 |
| Money and Securities.................................................. | $5,000 |
| Depositors Forgery...................................................... | $2,500 |

<u>Auto Coverages</u>:

| | |
|---|---|
| Owned Autos................................................................. | $1,000,000 Combined Single Limit |
| Non-Owned Auto Liability......................................... | $500,000 Combined Single Limit |

(including coverage for delivery or catering if applicable)

<u>Comprehensive Liability Coverages</u>:
(Including coverage for Builders Risk Liability
during construction or remodeling of franchised
premises)

| | |
|---|---|
| Per Occurrence Limit................................................. | $2,000,000 |
| Aggregate Limit........................................................... | $4,000,000 |

INCLUDING THE FOLLOWING:

Premises and Operations
Products and Completed Operations
Spouse or Partners as Insureds
Parking Area Liability
Medical Payments ($5,000 limit)
Contractual Liability
Fire/Tenants Legal Liability ($75,000 limit)
Broad Form Property Damage
Broad Form Vendors
Personal Injury (including trademark infringement)
Advertising Injury Liability

Employment Practices Liability Limit........................      $100,000
(higher limits recommended)

Workers' Compensation Limits:
For all employees including delivery drivers
Each accident..................................................................      $500,000
Disease Each Employee..................................................      $500,000
Policy Limit....................................................................      $500,000

If the Franchisee's Restaurant offers delivery service, the Franchisee shall be required to only hire drivers who carry at least $100,000 personal liability insurance.

If your Restaurant offers beer and wine sales, you are required to carry liquor liability insurance of at least $1,000,000.

B.    The Franchisor, Chicago Franchise Systems, Inc., David C. Howey, Jr. and all corporations owned or controlled by the Franchisor and all other parties in interest that may become liable shall be included as additional insureds as their interests may appear and a certificate or policy of insurance, reflecting full compliance with the foregoing requirements, shall at all times be kept on deposit with the Franchisor.

C.    All insurance coverage shall be provided by Farmers Insurance Group exclusively through Candos Insurance Agency of Palos Park, Illinois and shall be subject to cancellation or amendment only after the Franchisor has been given written notice at least thirty (30) days in advance of such intended cancellation or amendment.

D.    If the Franchisee fails to comply with these insurance requirements, the Franchisor may, but is not required to, either obtain such insurance, with the Franchisee reimbursing the Franchisor the amount of premium immediately upon demand, or terminate this Agreement in its entirety.

E.    The Franchisee at its sole expense shall and does hereby hold harmless the Franchisor, its affiliated companies, officers, directors, shareholders, employees, agents, attorneys, successors and assigns from any and all liability or expense arising from any claim, demand, action, suit or other proceeding resulting from or connected with the operation of

– 22 –

the Restaurant by the Franchisee or the Franchisee's employees or agents, and the Franchisee shall fully indemnify the Franchisor and its related parties for any loss sustained in connection therewith.

X.  NON-COMPETITION

A.  The Franchisee (and if the Franchisee is a corporation or other business entity, the Franchisee's shareholder(s) or owner(s)) shall not, during the term of this Agreement and all extensions thereto, engage in the operation of (as an owner, shareholder, director, officer, partner, employee, member, agent, consultant or other similar capacity) or have a material financial interest in (i.e., by contributing directly or indirectly more than ten percent [10%] of the total capital) any restaurant business similar to that franchised hereunder (to wit: any restaurant or food service business whose annual gross sales from the sales of pizza and pasta [net of sales tax] shall account for fifteen percent [15%] or more of the total annual sales for such restaurant or food service business) without the express written consent of the Franchisor which may be withheld at the Franchisor's sole and unlimited discretion. Furthermore, for a continuous period of two (2) years from and after the expiration or termination of this Agreement the Franchisee (and if the Franchisee is a corporation or other business entity, the Franchisee's shareholder(s) or owner(s)) shall not engage in the operation of (as an owner, shareholder, director, officer, partner, employee, member, agent, consultant or other similar capacity) or have a material financial interest in (i.e., by contributing directly or indirectly more than ten percent [10%] of the total capital) any restaurant business similar to that franchised hereunder (to wit: any restaurant or food service business whose annual gross sales from the sales of pizza and pasta [net of sales tax] shall account for fifteen percent [15%] or more of the total annual sales for such restaurant or food service business) within (i) what had been the Franchisee's exclusive area if an exclusive area shall have been in effect on the date the Standard Franchise Agreement shall have expired or terminated (or within three [3] miles of the franchised premises if an exclusive area shall not have been in effect on the date the Standard Franchise Agreement shall have expired or terminated); and (ii) within three (3) miles of any other Nancy's Pizza Restaurant in operation on the date this Standard Franchise Agreement shall have expired or terminated.

B.  Upon the expiration or termination hereof, the Franchisee shall not represent or advertise that the Franchisor and the Franchisee were formerly parties to a franchise agreement or that the Franchisee did business under the Trademarks or name of the Franchisor or any derivative thereof.

C.  If the Franchisee breaches this non-competition clause, then the Franchisor may pursue damages, injunctive relief and such other relief to which it may be entitled in law or equity without prior notice to the Franchisee. The Franchisee shall be liable to the Franchisor for all expenses reasonably incurred in obtaining such relief, including the cost of investigation and proof of facts, court costs and attorneys' fees.

D.  The parties, and each of them, agree that the foregoing restrictions are fair and reasonable, and the parties have attempted in this Section to limit the Franchisee's right to compete only to the extent necessary to protect the Franchisor from unfair competition. The parties

– 23 –

hereby expressly agree that if the scope or enforceability of this Section is disputed at any time by the Franchisee, a court or arbitrator, as the case may be, may modify either or both of the aforesaid geographic and duration parameters to the extent that it deems necessary to make such geographic and/or duration parameters enforceable under applicable law, and not unreasonable, arbitrary or against public policy. The invalidity or unenforceability of a particular provision of this non-competition clause shall not affect the other provisions hereof, and the non-competition clause shall be construed in all respects as if such invalid or unenforceable provisions were omitted. In addition, the Franchisor reserves the right to reduce the scope of either or both of the aforesaid geographic and duration parameters at the Franchisor's sole and unlimited discretion and without the Franchisee's consent, at any time or times, effective immediately upon notice to the Franchisee.

## XI. TERMINATION

A.    The Franchisor may terminate this Agreement if the Franchisee shall default in the performance of any of the duties, responsibilities or obligations provided for in this Standard Franchise Agreement, or any other Agreement with the Franchisor or any affiliate of the Franchisor (unless such any other Agreement with the Franchisor shall expressly provide to the contrary); or fails to reasonably adhere to any service and operating standards in effect from time to time and further fails to cure and correct the foregoing, within fifteen (15) calendar days after the Franchisor gives written notice to Franchisee thereof.

B.    The Franchisor shall also have the right to terminate this Agreement immediately and without other cause or prior notice if the Franchisee either: (1) makes an assignment for the benefit of creditors; or (2) makes a written admission of his inability to pay his debts or obligations as they become due; or (3) files a voluntary petition in bankruptcy; or (4) is adjudicated a bankrupt or insolvent; or (5) files any petition or other pleading seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, or admitting or failure to contest the material allegations of a petition or other pleading filed against the Franchisee in any such proceeding; or (6) seeks, consents to or acquiesces in the appointment of any trustee, receiver or liquidator of his business, or all or a substantial part of his assets, or fails to vacate the appointment of any trustee, receiver or liquidator for any such purpose within thirty (30) days of such appointment; or (7) permits the continuance for more than thirty (30) days of any proceeding against the Franchisee seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; or (8) fails within thirty (30) days of the entry of a final judgment against the Franchisee in any amount exceeding Five Thousand Dollars ($5,000) to discharge, vacate or reverse such judgment or to stay execution thereon pending appeal or to discharge any such judgment which is not vacated or reversed within thirty (30) days after expiration of such stay of execution; or (9) allows a levy of execution to be made upon the franchise; or (10) voluntarily abandons or fails to actively operate the Restaurant for a period of more than seven consecutive days; or (11) contests in any manner the validity of the Franchisor's ownership of and/or the rights to its Trademarks and/or patents now existent or hereafter obtained; or (12) has his lease terminated or mortgage foreclosed by reason of his failure to pay rent or mortgage payments or for any other cause for which

– 24 –

he is responsible; or (13) submits any report or statement which understates his gross sales for any period by more than Two Percent (2%); or (14) makes an unauthorized assignment, transfer or sale; or (15) willfully or fraudulently misrepresents any fact or condition required by this Standard Franchise Agreement; or (16) fails to open his Nancy's Pizza Restaurant to the general public within eighteen (18) months after the execution of this Standard Franchise Agreement; or (17) fails to satisfactorily complete any initial courses of instruction prior to the commencement of the Franchisee's business operation as hereinabove required pursuant to Subsection V H, the determination as to whether the Franchisee shall have satisfactorily completed any such courses of instruction being within the Franchisor's sole though reasonable discretion; or (18) endangers the public's health in any Nancy's Pizza Restaurant; or (19) repeatedly fails to comply with the lawful provisions of this Agreement or any other Agreement with the Franchisor or with any affiliate of the Franchisor.

C.    In addition to the foregoing, and in addition to all other rights the Franchisor shall have at law and in equity, in the event of a default, the Franchisee, and any guarantors of the Franchisee, shall be liable to the Franchisor for all damages, costs and expenses, including reasonable attorneys' fees.

D.    All rights and obligations between the parties under this Standard Franchise Agreement shall terminate at midnight on the day preceding the date of expiration of the term hereof or, if applicable, of any extension thereto (or immediately upon termination by virtue of any default hereunder, as aforesaid) except for those obligations of the Franchisee which specifically or by their nature survive the termination of this Standard Franchise Agreement, and upon termination the Franchisee shall immediately discontinue the use of all trade names, Trademarks, signs, structures, and forms of advertising indicative of the Trademarks or the business or services thereof, and will make or cause to be made such changes in signs, buildings, and structures as the Franchisor shall reasonably direct so as to effectively distinguish the same from its former appearance and from any other location franchised by the Franchisor or location operated by the Franchisor. If the Franchisee shall upon request fail or omit to make such changes or cause them to be made, then the Franchisor shall have the right to enter upon the franchised premises, without being deemed guilty of trespass or any other tort, except by virtue of the Franchisor's gross and/or willful negligence or misconduct, and shall have the right to make such changes or cause them to be made at the expense of the Franchisee which expense the Franchisee shall pay upon demand. The Franchisee shall also upon the request and at the sole discretion of the Franchisor and upon the payment of the fair market value thereof, return to the Franchisor all supplies and other materials bearing the Trademarks, and the Franchisee shall discontinue use of telephone service as a Franchisee at the franchised premises and shall cause all telephone numbers to be transferred to such party as the Franchisor may direct (unless such telephone service shall have already been in the name of the Franchisor or the Franchisor's designee in accordance with Subsection V N hereinabove set forth).

E.    Upon the termination or expiration of this Standard Franchise Agreement for any reason whatsoever, the Franchisee shall retain no equity or other interest in and to the Trademarks or the Nancy's Pizza System.

– 25 –

F.   In the event of the expiration or termination of this Agreement for any reason whatsoever, the Franchisor shall have and is hereby granted the right and option (but not the obligation) to purchase some or all (at the Franchisor's discretion) of the Restaurant's equipment and/or other tangible assets. You agree to sell us, within sixty (60) days from the date of expiration for any reason whatsoever or termination any and all of the furniture, fixtures, and equipment and the purchase price for such equipment and assets shall be their fair market value or book value (whichever is less) and shall not contain any factor or increment for "goodwill" or "going concern value". The purchase price shall be paid in cash at the closing of the purchase which shall be within sixty (60) days from and after the exercise of the option by the Franchisor, and the Franchisee must convey to the Franchisor free and clear title to any such purchased equipment and/or assets.

## XII.   TAXES

The Franchisee shall promptly pay when due (1) all taxes levied or assessed by reason of the Franchisee's operation and performance under this Standard Franchise Agreement; (2) all rent or mortgage payments for the franchised premises; (3) all advertising fees and expenses; and (4) all charges and expenses incurred from any purveyor, contractor, and any other vendor. The Franchisee further agrees to pay state unemployment tax, state sales tax (including any sales or use tax on equipment purchased or leased), and all other taxes and expenses of operating the Restaurant. In the event of any bona fide dispute as to the liability for taxes assessed against the Franchisee, the Franchisee may contest the validity or the amount of the tax in accordance with procedures of the taxing authority. In no event, however, shall the Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant to occur against the franchised premises or Restaurant inventory, supplies or equipment. Upon demand, but in no event less frequently than quarterly (each three [3] months) during the term hereof and all extensions thereto, the Franchisee shall provide the Franchisor with such evidence as shall be reasonably required by the Franchisor confirming the payment by the Franchisee of all taxes (such evidence being inclusive of but not limited to payroll tax returns and payment receipts), rent or mortgage payments, advertising fees and expenses, and all charges and expenses incurred from any purveyor, contractor, and any other vendor.

## XIII.  GENERAL; NOTICES

A.   No waiver by the Franchisor of any breach, failure or default in performance by the Franchisee, and no failure, refusal or neglect of the Franchisor to exercise any right hereunder or to insist upon strict compliance with or performance of the Franchisee's obligations under this Standard Franchise Agreement, shall constitute a waiver of the provisions hereof with respect to any subsequent breach, failure or default or a waiver by the Franchisor of its rights at any time thereafter to require compliance with the provisions hereof.

B.   This Standard Franchise Agreement and the Addenda or Riders, if any, attached hereto constitutes the entire agreement of the parties (into which all prior negotiations, commitments, representations and undertakings with respect to the subject matter hereof

are merged), and, except as herein provided, and except for express information contained in the Franchisor's Franchise Disclosure Document relating specifically to this Franchise Agreement, the parties hereto acknowledge that there are no oral or written understandings or agreements between them relating to the subject matter hereof. This Standard Franchise Agreement shall be binding upon the parties hereto, their heirs, administrators, executors, successors, and assigns.

C.   No amendment or other modifications of this Standard Franchise Agreement shall be valid or binding on either party hereto unless reduced to writing and executed by the parties hereto.

D.   Franchisor may unilaterally at any time seek and obtain through any court of competent jurisdiction a temporary restraining order, and/or a temporary and/or permanent injunction against any action or inaction by the Franchisee which in the Franchisor's judgment is necessary to prevent or remedy any irreparable injury or damage to the Franchisor, the Trademarks, the Nancy's Pizza System, the Franchisor's goodwill, merchandise and/or other property, and/or any Nancy's Pizza Restaurant. Any litigation related to this Agreement will be conducted on an individual basis and not on a consolidated, class-wide or representative basis. If for any reason any portion of this Subsection XIII-D is ruled to be inapplicable or invalid, the parties waive, to the fullest extent allowed by law, any right to pursue any claims on a class or consolidated basis or in a representative capacity.

E.   This Standard Franchise Agreement shall be governed and construed under and in accordance with the laws of the State of Illinois. The Franchisee irrevocably consents to the exclusive jurisdiction and venue of the courts of the State of Illinois, County of Cook, and of any Federal court located in the State of Illinois, County of Cook, in connection with any action or proceeding arising out of or relating to this Standard Franchise Agreement.

F.   All clauses, phrases, provisions and portions of this Agreement are severable. If any clause, phrase, provision or portion of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable under applicable law, such invalidity or unenforceability shall not affect, impair or render invalid or unenforceable the remainder of this Agreement nor any other clause, phrase, provision or portion hereof, nor shall it affect the application of any clause, phrase, provision or portion hereof to other persons or circumstances.

G.   Whenever a personal pronoun is used herein, it is understood that such usage shall include both singular and plural, masculine, feminine and neuter and refer in appropriate cases to corporations or other business and legal entities as well as individuals.

H.   All written notices and other communications permitted or required to be given under this Agreement shall be deemed so given:

1.   If by the Franchisee, when actually delivered or when placed in the U.S. Mail by Certified Mail, Return Receipt Requested, postage prepaid, or via Federal Express or another comparable overnight delivery service, and addressed to the Franchisor,

Chicago Franchise Systems, Inc., 18861 90th Avenue, Suite H, Mokena, Illinois 60448, or to such other address as the Franchisor may from time to time designate in writing;

2.      If by the Franchisor, when actually delivered or when placed in the U.S. Mail, postage prepaid, or via Federal Express or another comparable overnight delivery service, and addressed to the Franchisee, at Yves Lesly Dominique of 635 Varina Way, Alpharetta, Georgia 30022 or to such other address as the Franchisee may from time to time designate in writing.

I.      If the Franchisee consists of more than one (1) person, each person's liability under this Standard Franchise Agreement shall be joint and several.

J.      In the event that the Franchisor should retain counsel and file a lawsuit against the Franchisee for violation of or to enforce any of the covenants, conditions and/or agreements of this Standard Franchise Agreement, or should the Franchisee file a lawsuit against the Franchisor for violation of any of the covenants, conditions and/or agreements of this Standard Franchise Agreement, or should either party file a lawsuit against the other for a declaration of rights hereunder, or should either party intervene in a lawsuit in which the other is a party, to enforce or protect its interest or rights hereunder, the Franchisor shall be entitled to and the Franchisee shall pay the Franchisor for all of its costs, expenses and reasonable fees of its attorney(s) in connection therewith.

K.      From time to time from and after the execution of this Standard Franchise Agreement and upon each direct or indirect transfer of an interest in this Agreement or in the Franchisee upon the Franchisor's request, the Franchisee shall, within five (5) days prior to such transfer or at any other time at the Franchisor's request, furnish the Franchisor with an estoppel instrument indicating any and all causes of action, if any, that the Franchisee may have against the Franchisor, or if none exist a statement to that effect, and a list of shareholders or partners having an interest in this Agreement or in the Franchisee, the percentage interest of each shareholder or partner, and a list of all officers and directors, in such form as the Franchisor may require.

L.      THE FRANCHISEE ACKNOWLEDGES THAT HE HAS ENTERED INTO THIS AGREEMENT AFTER MAKING AN INDEPENDENT INVESTIGATION OF THE FRANCHISOR'S OPERATIONS.

THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK

**FTC/16-17**

IN WITNESS WHEREOF, the parties hereto have executed this Standard Franchise Agreement on the day and year first above written.

Franchisor:

Chicago Franchise Systems, Inc.,
an Illinois corporation

DATE: March 21, 2017

By _____
David C. Howey, Jr., President

(Corporate Seal)

ATTEST:

_____
David C. Howey, Jr., Secretary

Franchisee: Yves Lesly Dominique

DATE: March 21, 2017

_____
Yves Lesly Dominique

– **29** –

FTC/16-17

## EXHIBIT 1

GENERAL RELEASE - TERMINATION

## GENERAL RELEASE

KNOW ALL PERSONS BY THESE PRESENTS, that for and in consideration of Ten and No/100 Dollars ($10.00); as an inducement to _____, a(n)_____ _____ corporation, to execute a _____, 20___ "Franchise Termination Agreement" pursuant to which the _____, 20___ Standard Franchise Agreement executed by and between and_____, of _____ and_____of _____ shall be terminated upon the terms and provisions therein set forth, such Franchise Termination Agreement being incorporated herein in its entirety and made a part hereof by this reference; and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged; the undersigned_____, of _____ and _____ of_____, for themselves and on behalf of their spouses, heirs, executors, administrators, successors, assigns, representatives, agents, employees, attorneys, and owned and/or controlled companies, as the case may be (collectively, the "Releasors"), do hereby jointly and severally remise, release and forever discharge _____, its successors, assigns, officers, directors, shareholders, representatives, agents, employees, attorneys, and owned, controlled and/or affiliated companies, as the case may be (collectively, the "Released Parties"), of and from all manner of actions, cause and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands, costs and expenses (including attorneys' fees), whatsoever, in law or in equity, whether they are presently known or unknown or suspected or unsuspected, whether liquidated or unliquidated, fixed or contingent or direct or indirect, and particularly, without limiting the generality of the foregoing, as any of the foregoing may relate to or arise from any obligations of the Released Parties to any of the Releasors which shall have accrued pursuant to that_____, 20___ Standard Franchise Agreement referred to in the aforesaid Franchise Termination Agreement, which the Releasors now have against any of the Released Parties, or which the Releasors shall or may have, for, upon, or by reason of any matter, cause, or thing, whatsoever on or at any time prior to the date hereof.

The Releasors further state that they have read and understand that this is a General Release and that they intend to be legally bound by the same. Any breach by any of the Releasors of this General Release shall be deemed to be and shall be a breach of contract for which any of the Released Parties shall have a cause of action for breach of contract and for which any of the Released Parties may pursue the available remedies for breach of contract, inclusive of but not limited to the recovery of damages, costs, and reasonable attorneys' fees.

In Witness Whereof, the undersigned have executed this General Release on this _____ day of _____, 20___.

_____

_____

FTC/16-17

## RELEASOR NOTARIZATION

STATE OF          )
                          )    SS:
COUNTY OF      )

       I, the undersigned, a Notary Public in and for said County and State, do hereby certify that
_____, of _____ and_____,
of _____, personally known to me to be the same persons whose names are
subscribed to the foregoing instrument, appeared before me this day in person and acknowledged
that they signed, sealed and delivered the said instrument, individually, as their free and voluntary
act, for the uses and purposes therein set forth.

       GIVEN under my hand and official seal this _____ day of _____,
20___ .

_____

Notary Public

My commission expires:

_____

## EXHIBIT 2

## STANDARD LEASE OPTION AGREEMENT

### CHICAGO FRANCHISE SYSTEMS, INC.
### STANDARD LEASE OPTION AGREEMENT

     STANDARD LEASE OPTION AGREEMENT made this \_\_\_ day of _____, _____ by and between _____

_____

(hereinafter referred to as the "Lessor"); _____

_____

(hereinafter referred to as the "Lessee"); and Chicago Franchise Systems, Inc., an Illinois corporation having its principal office located at 18861 90th Avenue, Suite H, Mokena, Illinois 60448 (hereinafter referred to as "Chicago Franchise" and all instances of the defined term "Chicago Franchise" shall mean Chicago Franchise Systems, Inc. or its assignee).

     The Lessor has agreed to lease to the Lessee premises located at _____ for use by the Lessee as a Nancy's Pizza Restaurant under a Franchise Agreement between Chicago Franchise, as Franchisor, and the Lessee, as Franchisee. A copy of the Lease dated _____, _____ between the Lessor and the Lessee (the "Lease") is attached hereto as Exhibit A. This Standard Lease Option Agreement is entered into in connection with Chicago Franchise's approval of the above location as a Nancy's Pizza Restaurant and the grant of a Franchise to the Lessee. This Standard Lease Option Agreement is intended to provide Chicago Franchise with the opportunity to preserve the premises as a Nancy's Pizza Restaurant should the Lease or Franchise Agreement be terminated, and to assure the Lessor that if Chicago Franchise, or its assignee exercises the option herein contained, any defaults of the Lessee under the Lease will be cured by Chicago Franchise or its assignee.

     NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL COVENANTS HEREIN CONTAINED, AND FOR THE OTHER GOOD AND VALUABLE CONSIDERATION, IT IS AGREED AS FOLLOWS:

     1.    The Lessor shall mail to Chicago Franchise copies of all notices of default it gives to the Lessee concurrently with giving such notices to the Lessee; and Chicago Franchise shall mail to the Lessor copies of all notices of default it gives to the Lessee concurrently with giving such notices to the Lessee. If the Lessee fails to cure any defaults within the period specified in the Lease or the Franchise Agreement, the Lessor shall give Chicago Franchise, and/or Chicago Franchise shall give the Lessor, immediate written notice of that fact and the Lessor shall thereupon offer to Chicago Franchise, or its assignee (and Chicago Franchise or its assignee shall have) the right to accept either an assignment of the Lease or a new lease containing the same terms and conditions as the Lease, whichever Chicago Franchise or its assignee elects. If Chicago Franchise or its assignee elects to continue the use of the premises as a Nancy's Pizza Restaurant, under an assignment of the Lease or a new lease, it shall so notify the Lessor in writing within thirty (30) days after it has received written notice from the Lessor specifying the exact defaults the Lessee has failed to cure within the period specified in the Lease, if any. Upon receipt of such notice from Chicago Franchise, the Lessor shall promptly execute and deliver to Chicago Franchise an

assignment of the Lease or a new lease, whichever Chicago Franchise requests, and shall deliver to Chicago Franchise immediate possession of the premises, free and clear of any rights of the Lessee or any third party. Chicago Franchise or its assignee may thereupon take immediate possession of the premises, and shall cure any bona fide defaults specified by the Lessor in its notice to Chicago Franchise within ninety (90) days from and after the date it or its assignee takes possession of the premises and shall execute and deliver to the Lessor its acceptance of the assignment of Lease or the new lease, as the case may be, or Chicago Franchise shall give notice to the Lessor of its intent to assign the rights hereunder to a third party franchisee of Chicago Franchise.

2.      If the Franchise Agreement between Chicago Franchise and the Lessee is terminated for any reason during the term of the Lease or any extension thereof, the Lessee, upon the written request of Chicago Franchise shall assign to Chicago Franchise all of its right, title and interest in and to the Lease. If Chicago Franchise elects to accept the assignment of the Lease from the Lessee, it shall give the Lessee and the Lessor written notice of its election to acquire the leasehold interest. The Lessor hereby consents to the assignment of the Lease from the Lessee to Chicago Franchise, subject to the Lessee's and/or Chicago Franchise's curing any defaults of the Lessee under the Lease within ninety (90) days after Chicago Franchise or its assignee takes possession of the premises. Alternatively, in the event of a termination of the Franchise Agreement, Chicago Franchise may elect to enter into a new lease with the Lessor containing the same terms and conditions as the Lease. Upon the Lessor's receipt of written notice from Chicago Franchise advising the Lessor that Chicago Franchise elects to enter into a new lease, the Lessor shall execute and deliver such new lease to Chicago Franchise for its acceptance. The Lessor and the Lessee shall deliver possession of the premises to Chicago Franchise, free and clear of all rights of the Lessee or third parties, subject to Chicago Franchise's curing any bona fide defaults of the Lessee, under the Lease and executing an acceptance of the assignment of the Lease or the new lease, as the case may be.

3.  The Lessee hereby designates the Lessor and Chicago Franchise as its agents to execute any and all documents, agreements and to take all action as may be necessary or desirable to effectuate the assignment of the Lease and the relinquishment of any and all of the Lessee's rights thereunder in the event of the Lessee's failure to timely cure defaults under the Lease or of termination of the Franchise Agreement. The Lessor and the Lessee agree not to amend the Lease except with the prior written consent of Chicago Franchise. The Lessee further agrees to peaceably and promptly vacate the premises and to remove its personal property therefrom at the written request of the Lessor or Chicago Franchise upon the Lessee's failure to timely cure defaults under the Lease or upon the termination of the Franchise Agreement, for any reason. Any property not so removed by the Lessee within ten (10) days following receipt of such written notice shall be deemed abandoned by the Lessee, and shall become the property of Chicago Franchise at Chicago Franchise's sole and unlimited discretion. Chicago Franchise shall not be required to cure defaults and/or to begin paying rent until delivery to it of possession of the premises, free and clear of any of the Lessee's rights or rights of third parties. If it becomes necessary for the Lessor to pursue legal action to evict the Lessee in order to deliver possession of the premises to Chicago Franchise, all rental amounts during this period shall be abated in full pending delivery of the premises to Chicago Franchise. If the Lessor is unable to deliver the premises to Chicago Franchise within four (4) months from the date Chicago Franchise notifies the Lessor of its election to continue the

use of the premises as a Nancy's Pizza Restaurant, Chicago Franchise shall have the right at any time thereafter to withdraw its election to accept assignment of the Lease for the premises. The Lessee shall remain liable for all of its obligations under the Lease notwithstanding the assignment thereof to Chicago Franchise or the execution of a new lease between Chicago Franchise and the Lessor, and Chicago Franchise shall be entitled to recover from the Lessee all amounts it has paid to the Lessor to cure the Lessee's defaults under the Lease. Chicago Franchise may assign without recourse its rights under this Standard Lease Option Agreement or its rights under the assignment of Lease or the new lease without the consent of the Lessor, to a franchisee of Chicago Franchise; provided, however, that in the case of an assignment, the assignee shall execute and deliver to the Lessor an assumption agreement by which the assignee agrees to assume the Lease or new lease and to observe the terms and conditions and agreements on the part of the Lessee to be performed under the Lease or new lease, as the case may be. The Lessee shall remain a guarantor of the Lease in the case of such assignment of the Lease or a new lease. All notices hereunder shall be by certified mail to the addresses herein described or to such other addresses as the parties hereto may, by written notice, instruct that notices be given.

4. It is agreed by all parties hereto, that the premises have or will have specific identifying trade dress, signs and decor unique to Nancy's Pizza Restaurants. If the Lease is terminated or the Franchise Agreement is terminated and Chicago Franchise does not elect to continue the location as a Nancy's Pizza Restaurant, the Lessee agrees to de-identify the premises as a Nancy's Pizza Restaurant and to promptly remove all trade dress including signs, decor and other items which Chicago Franchise reasonably requests be removed as being distinctive and indicative of a Nancy's Pizza Restaurant. Chicago Franchise may enter upon the premises without being guilty of trespass or tort, and the Lessor shall make the entry by Chicago Franchise possible, to affect such de-identification if the Lessee fails to affect such de-identification within ten (10) days after the termination of the Franchise Agreement or the Lease and Chicago Franchise may bill the Lessee for its reasonable costs and expenses in effecting de-identification.

5. This Standard Lease Option Agreement shall run with the land and be binding upon the parties hereto and their successors, assigns, executors, administrators and representatives. The rights and obligations herein contained shall continue, notwithstanding changes in the persons or entity that may hold any leasehold or ownership in the land or building. Any party hereto may record this Standard Lease Option Agreement or a memorandum hereof. Any party hereto may seek equitable relief or injunctive relief including, without limitation, specific performance for actual or threatened violation or non-performance of this Agreement by any other party. Such remedies shall be in addition to all other rights provided for in this Standard Lease Option Agreement or by law.

6. The Lessee authorizes any and all communications, whether written or verbal between Chicago Franchise and the Lessor. The Lessee also authorizes the Lessor and Chicago Franchise to share any and all information regarding, but not limited to, the payments of rent and sales information of the Lessee.

7. The Lessee and the Lessor agree that all equipment, small wares, furniture and leasehold improvements of any nature, within the premises and used within the premises for the operation of the business (the "Collateral") shall remain in the premises after any termination or

assignment of the Lease or Franchise Agreement and shall be considered collateral given, free and clear of any liens or encumbrances, to Chicago Franchise for its acceptance of the assignment of the Lease, if such acceptance of the assignment of the Lease or a new lease is agreed to by Chicago Franchise. If Chicago Franchise accepts the assignment of the Lease or a new lease, and for any reason there should exist a lien against the Collateral, Chicago Franchise shall have the right, but not the obligation, to negotiate new terms with the lien holder or to pay all amounts due and owing to the lien holder to affect the free and clear transfer of title of the Collateral to Chicago Franchise. The Lessee gives Chicago Franchise the right to unrestricted communication with any and all lien holders, banks or other financial institutions involved with the Lessee and its ownership in the Collateral, premises and Franchise. Such communication shall include, but not necessarily be limited to the sharing of sales information and financial information. If there is a debt or loan amount due a lien holder, bank, financial institution or other such entity, pertaining to the Collateral, that can be assumed by Chicago Franchise or its assignee, the Lessee hereby agrees to the assumption and also agrees to remain as a guarantor of the debt and/or loan amount for Chicago Franchise or its assignee until such time as the debt or loan amount is paid in full.

8.     All clauses, phrases, provisions and portions of this Standard Lease Option Agreement are severable. If any clause, phrase, provision or portion of this Standard Lease Option Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable under applicable law, such invalidity or unenforceability shall not affect, impair or render invalid or unenforceable the remainder of this Standard Lease Option Agreement nor any other clause, phrase, provision or portion hereof, nor shall it affect the application of any clause, phrase, provision or portion hereof to other persons or circumstances.

THE B ALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK

**FTC/16-17**

IN WITNESS WHEREOF, the parties hereto have caused this Standard Lease Option Agreement to be executed the day and year first above written.

Lessor:

_____

Lessee:

_____

Franchisor:

Chicago Franchise Systems, Inc.

By:_____

FTC/16-17

## EXHIBIT 3

GENERAL RELEASE - ASSIGNMENT

## GENERAL RELEASE

KNOW ALL PERSONS BY THESE PRESENTS, that for and in consideration of Ten and No/100 Dollars (\$10.00); as an inducement to _____, a(n)_____ corporation, to execute a "Consent to Assignment" approving the undertakings set forth in that _____, 20___ "Assignment Agreement" and "Assumption by Assignee" executed by, between and among _____of _____and _____, of _____ collectively, as the "Assignor," and _____, of _____ and _____ of _____, collectively, as the "Assignee," such Assignment Agreement and Assumption being incorporated herein in their entireties and made a part hereof by this reference; and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged; the undersigned _____, of _____and _____ of _____, for themselves and on behalf of their spouses, heirs, executors, administrators, successors, assigns, representatives, agents, employees, attorneys, and owned and/or controlled companies, as the case may be (collectively, the "Releasors"), do hereby jointly and severally remise, release and forever discharge _____, its successors, assigns, officers, directors, shareholders, representatives, agents, employees, attorneys, and owned, controlled and/or affiliated companies, as the case may be (collectively, the "Released Parties"), of and from all manner of actions, cause and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands, costs and expenses (including attorneys' fees), whatsoever, in law or in equity, whether they are presently known or unknown or suspected or unsuspected, whether liquidated or unliquidated, fixed or contingent or direct or indirect, and particularly, without limiting the generality of the foregoing, as any of the foregoing may relate to or arise from any obligations of the Released Parties to any of the Releasors which shall have accrued pursuant to that_____, 20___, Standard Franchise Agreement referred to in the aforesaid Assignment Agreement, which the Releasors now have against any of the Released Parties, or which the Releasors shall or may have, for, upon, or by reason of any matter, cause, or thing, whatsoever on or at any time prior to the date hereof.

The Releasors further state that they have read and understand that this is a General Release and that they intend to be legally bound by the same. Any breach by any of the Releasors of this General Release shall be deemed to be and shall be a breach of contract for which any of the Released Parties shall have a cause of action for breach of contract and for which any of the Released Parties may pursue the available remedies for breach of contract, inclusive of but not limited to the recovery of damages, costs, and reasonable attorneys' fees.

FTC/16-17

In Witness Whereof, the undersigned have executed this General Release on this_____ day of _____, 20___.

_____

_____

## RELEASOR NOTARIZATION

STATE OF          )
                    )    SS:

COUNTY OF     )

I, the undersigned, a Notary Public in and for said County and State, do hereby certify that _____, of _____ and _____, of _____, personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that they signed, sealed and delivered the said instrument, individually, as their free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and official seal this _____ day of _____, 20___.

_____

Notary Public

My commission expires:

_____

FTC/16-17

EXHIBIT 4

GUARANTEE

## GUARANTEE

On this March 21, 2017, in consideration of TEN DOLLARS ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned Guarantor(s) hereby (jointly and severally if there are more than one Guarantor) guarantees the prompt payment of all royalties, fees, contributions, and other expenses by the Franchisee to be paid and the performance by the Franchisee, the Franchisee's heirs, executors, administrators, successors or assigns of all the covenants, and agreements as set forth in the above Standard Franchise Agreement and the Addenda or Riders, if any, attached thereto and agrees to be personally bound to the "confidentiality" and "non-competition" restrictions set forth in Section VII, Section X and elsewhere of such Standard Franchise Agreement to the extent as if the undersigned were a signatory thereto; the undersigned being jointly and severally liable with the Franchisee for all of the obligations hereinabove set forth in this Guarantee. This Guarantee shall be interpreted in accordance with the law of the State of Illinois applicable to agreements made and to be wholly performed within the State of Illinois. The undersigned Guarantor(s) irrevocably consents to the exclusive jurisdiction and venue of the Courts of the State of Illinois, County of Cook, and of any Federal Court located in the State of Illinois, County of Cook, in connection with any action or proceeding arising out of or relating to this Guarantee.

Yves Lesly Dominique

# EXHIBIT 2

USPS TRACKING # **9114 9999 4431 3905 4209 01**
& CUSTOMER          For Tracking or inquiries go to USPS.com
RECEIPT LABEL (ROLL)   or call 1-800-222-1811.



*Nancy's*

PIZZERIA

## CHICAGO FRANCHISE SYSTEMS, INC.

18861 90ᵀᴴ AVENUE, SUITE H, MOKENA, ILLINOIS 60448
VOICE (708)478-8440 FAX (708)478-8499
dhowey@chicagofranchise.com

October 28, 2019

Yves Lesly Dominique
Nancy's Pizzeria
4705 C Ashford Dunwoody Road
Dunwoody, GA 30338

PERSONAL AND CONFIDENTIAL
CERTIFIED MAIL- RETURN RECEIPT REQUESTED:
Re:Franchise Agreement Default
4705 C Ashford Dunwoody Road
Dunwoody, GA 30338

Dear Mr. Dominique,

Please direct your attention to the March 21, 2017 Chicago Franchise Systems, Inc. Standard Franchise Agreement (the "Franchise Agreement") having been executed by and between the Franchisor and you. The Franchise Agreement governs your ownership and operation of your franchised Nancy's Pizzeria Restaurant located at 4705 C Ashford Dunwoody Road, Dunwoody,GA (the "franchised premises").

Your attention is directed to Subsection IV.D. of the Franchise Agreement which requires you to "…pay the Franchisor a continuing and non-refundable royalty in an amount equal to six percent (6.00%) of the Franchisee's gross sales (as hereinafter defined), Such royalty to be computed, due and payable on a weekly basis as hereinafter designated. "

Your attention is further directed to Subsection XI.B of the Franchise Agreement which states " The Franchisor shall have the right to terminate this Agreement immediately and without other cause or prior notice if the Franchisee either: ….(19) repeatedly fails to comply with the lawful provisions of this Agreement or any other Agreement with the Franchisor or with any affiliate of the Franchisor."

This correspondence shall serve to formally notify you that you are in default of your Franchise Agreement as a result of not paying required royalty in the amount of 6% of gross sales and the required advertising fee in the amount of 3% of gross sales. As a result, thereof, the Franchise Agreement is subject to termination, in addition to all other rights and remedies the Franchisor possesses.

In accordance with the Franchise Agreement, you must correct the foregoing defaults by:

Immediately paying the past due weekly 6% royalties owed to the Franchisor as follows:

10/21/2019 in the amount of $951.79

10-26-2019 in the amount of $919.90

A Total of $1871.69

If you fail to correct the foregoing defaults within the time period prescribed by the Franchise Agreement, the Franchisor shall be free to terminate the Franchise Agreement and the underlying Nancy's Pizza Franchise.  That is without prejudice to the Franchisor's right at any time to pursue such other legal remedies it deems appropriate, including but not limited to, damages, injunctive relief, costs and attorneys' fees.

We urge you to give this matter your immediate attention.

Sincerely,
Chicago Franchise Systems, Inc.


By: _____
David C. Howey, Jr., President

2

# EXHIBIT 3



**CHICAGO FRANCHISE SYSTEMS, INC.**
18861 90TH AVENUE, SUITE H, MOKENA, ILLINOIS 60448
VOICE (708)478-8440 FAX (708)478-8499
dhowey@chicagofranchise.com

February 5, 2020

Yves Lesly Dominique
635 Varina Way
Alpharetta, Georgia 30022

PERSONAL AND CONFIDENTIAL
CERTIFIED MAIL- RETURN RECEIPT REQUESTED:
Re: Franchise Agreement Default at
Nancy's Pizzeria
4705 C Ashford Dunwoody Road
Dunwoody, GA 30338

Mr. Dominique:

Please direct your attention to the March 21, 2017 Chicago Franchise Systems, Inc. Standard Franchise Agreement (the "Franchise Agreement") having been executed by and between the Franchisor and you. The Franchise Agreement governs your ownership and operation of your franchised Nancy's Pizzeria Restaurant located at 4705 C Ashford Dunwoody Road, Dunwoody,GA (the "franchised premises").

Your attention is directed to Subsection IV.D. of the Franchise Agreement which requires you to "…pay the Franchisor a continuing and non-refundable royalty in an amount equal to six percent (6.00%) of the Franchisee's gross sales (as hereinafter defined), Such royalty to be computed, due and payable on a weekly basis as hereinafter designated. "

Your attention is also directed to Subsection IV.E. of the Franchise Agreement which requires you to "…pay the Franchisor a continuing and non-refundable advertising fee in an amount equal to three percent (3%) of the Franchisee's gross sales (as hereinafter defined), such advertising fee to be computed, due and payable on a weekly basis as hereinafter designated."

Your attention is further directed to Subsection XI.B of the Franchise Agreement which states " The Franchisor shall have the right to terminate this Agreement immediately and without other cause or prior notice if the Franchisee either: ….(19) repeatedly fails to comply with the lawful provisions of this Agreement or any other Agreement with the Franchisor or with any affiliate of the Franchisor."

This correspondence shall serve to formally notify you that you are in default of your Franchise Agreement as a result of not paying the required royalty in the amount of 6% of gross sales totaling $14,924.62 as of the date of this notice, and the required advertising fee in the amount of 3% of gross sales in the amount of $5,249.50 as of the date of this notice. You had been given written notice back on October 28th of your default for not making the required payments and you have continued to default by not making any royalty or advertising fee required weekly payments, ignoring all additional notices and billings sent to you.

If you fail to correct the foregoing defaults within the time period prescribed by the Franchise Agreement, the Franchisor shall be free to terminate the Franchise Agreement and the underlying Nancy's Pizza Franchise. That is without prejudice to the Franchisor's right at any time to pursue such other legal remedies it deems appropriate, including but not limited to, damages, injunctive relief, costs and attorneys' fees.

We urge you to give this matter your immediate attention.

Sincerely,
Chicago Franchise Systems, Inc.


By: _____
David C. Howey, Jr., President


Copy to:
Yves Lesly Dominique
Nancy's Pizzeria
4705 C Ashford Dunwoody Road
Dunwoody, GA 30338


Via Certified Mail, Return Receipt Requested

2

# EXHIBIT 4



**CHICAGO FRANCHISE SYSTEMS, INC.**
18861 90ᵀᴴ Avenue, Suite H, Mokena, Illinois 60448
Voice (708)478-8440 Fax (708)478-8499
dhowey@chicagofranchise.com

February 26, 2020

Yves Lesly Dominique
635 Varina Way
Alpharetta, GA 30022

PERSONAL AND CONFIDENTIAL
CERTIFIED MAIL- RETURN RECEIPT REQUESTED, eMail:
Re:Franchise Agreement Termination
4705 C Ashford Dunwoody Road
Dunwoody, GA 30338

Dear Mr. Dominique:

You are directed to that March 21, 2017 Chicago Franchise Systems, Inc. Standard Franchise Agreement (the "Franchise Agreement") between the Franchisor and you, which governs your ownership and operation of your franchised Nancy's Pizzeria Restaurant located at 4705 C Ashford Dunwoody Road, Dunwoody,GA.

By letter dated October 28, 2019, Franchsior notified you that you are in default under the Franchise Agreement for failing to pay to Franchisor a continuing and non-refundable royalty in an amount equal to 6% of gross sales and by failing to pay the required advertising fee in the amount of 3% of gross sales. You failed to cure your defaults under the Franchise Agreement.

Given your failure to cure your defaults under the Franchise Agreement, you are notified that your Franchise Agreement is hereby terminated.

You must immediately cease operations as a Nancy's Pizzeria, de-identify your restaurant from any and all Nancy's decor, trade-dress, information, signage, etc., cease using any Nancy's Pizzeria proprietary products, immediately discontinue the use of all of Franchisor's trade names, trademarks, signs, structures, and forms of advertising indicative of Franchisor's trademarks or the business or services thereof and must make or cause to be made such changes in signs, buildings, and structures so as to effectively distinguish your former Nancy's Pizzeria Restaurant from its former appearance and from any other Nancy's Pizzeria Restaurant. You must also discontinue use of telephone service as a Nancy's Pizzeria, at the former franchised premises and shall cause all telephone numbers to be transferred to Franchisor and comply with all other post-termination obligations contained in the Franchise Agreement, including without limitation those contained in Article XI, and all post-term covenants contained in Article X.

That is without prejudice to the Franchisor's right at any time to pursue such other legal remedies it deems appropriate, including but not limited to, damages, injunctive relief, costs and attorneys' fees.

Sincerely,
Chicago Franchise Systems, Inc.

By: _____
David C. Howey, Jr., President

Copy to:
Yves Lesly Dominique
Nancy's Pizzeria
4705 C Ashford Dunwoody Road
Dunwoody, GA 30338

Michael Boxerman
marcus&boxerman
20 North Clark Street, Suite #2500
Chicago, Illinois 60602




PITNEY BOWES
$ 06.99

7009 0080 0002 3222 4287

**CHICAGO FRANCHISE**
SYSTEMS, INC.

18861 90th Avenue • Suite H
Mokena, Illinois 60448

FIRST CLASS

Nancy's Pizzeria
Yves Lesly Dominique
4705 C Ashford Dunwoody Road
Dunwoody, GA 30338

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

NANCY'S PIZZERIA
YVES LESLY DOMINIQUE
4705 C ASHFORD DUNWOODY RD.
DUNWOODY, GA 30338

9590 9402 1523 5362 6148 97

2. Article Number (Transfer from service label)

7009 0080 0002 3222 4287

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)      C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:            ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

# **<u>EXHIBIT 5</u>**



# EXHIBIT 6



# Nancy's Pizzeria

DashPass · Inventors of the Stuffed Pizza · 4.5 ★ (720+ ratings) · 5898.1 mi · $$

More Info

| **$0.00**<br>delivery fee, first order | **--**<br>delivery time |
| --- | --- |

Group Order | **Delivery** | Pickup

**Enter Your Delivery Address**
This will help us confirm the store's availability and delivery fees

Address

Sign in for saved address

Local restaurants delivered in 45 minutes    **More**

**Full Menu**
4:00 pm – 8:40 pm

Popular Items    Appetizers    Salads    Sandwiches    Pastas    Stuffed Pizzas    Gluten Free Pizza    Original Thin Pizza    Gar >

## Popular Items
The most commonly ordered items and dishes from this store







Formerly known as Nancy's Pizzeria, we rebranded and we're now Kiskeya Pizza.



## Kiskeya Pizza (Formerly Nancy's Pizzeria)

4705-C Ashford Dunwoody Rd, Dunwoody, GA 30338

772-758-7766   NEW

Open until 8:45 PM    Full Hours

| Best Sellers | Chicago Stuffed Pizza | Original Thin Pizza | Gluten Free Pizza | Signature Stuffed Pizza | Signature Thin Crust Pizza | More ⌄ |

## Deals and Coupons

| Deal  Featured | |
|---|---|
| Buy Two Small Chicago Stuffed Cheese Pizza Get 3 Mozzarella Sticks for FREE |  |
| $40 | |

| Deal | |
|---|---|
| Buy Two Medium Chicago Stuffed Cheese Pizza Get 6 Mozzarella Sticks for FREE |  |
| $48 | |

## Best Sellers

**Chicago Stuffed Cheese Pizza**
Classic cheese or create your own pizza.
$22.90



**Stuffed A Lot A Meat Pizza**
Canadian bacon, Italian sausage, pepperoni, bacon.
$36.75



**Buffalo Chicken Salad**
Romaine, radicchio, gorgonzola, bacon, banana peppers, blue cheese dressing.
$12.50



**Meatball Trio**
Roasted meatballs, marinara, spinach, crostini.
$11.00



**Blueberry Pecan Salad**
Arugula, radicchio, feta, candied pecans, poppy seed dressing.



**Fettuccine Alfredo**
Cream, parmesan, parsley.





# Nancy's Pizza (Dunwoody)

⭐ 4.5 (70 ratings) • Italian • $$ • More info

4705-C Ashford Dunwoody Rd, Atlanta, GA 30338

Tap for hours, address, and more

Enter your address above to see fees, and delivery + pickup estimates.

$$ • Italian • Pizza • Family Friendly

🗓 Schedule

### Picked for you

## Picked for you

### Chicago Stuffed Cheese Pizza
$26.35

4 slices. Serves 2 to 3 peoples. A thick, round pie with a high, crisp, golden crust ringed around a red sauce center, hiding a thin layer of top crust that covers the mozzarella magma.



### Original Thin Cheese Pizza
$14.90

16 slices. Serves 1 to 2 peoples. A tried and true classic. The perfect complement to stuffed pizza pie.



### Chicken Wings with Bone
$11.90

Served with blue cheese.



### Caesar Salad
$12.00

Romaine, arugula, bacon, parmesan, croutons, and garlic Caesar dressing. Served with Italian breadsticks.

### Classic Cannoli
$11.00

Ricotta cream and chocolate chips. Three pieces.



## Appetizers

### Meatball Trio
$13.90



### Chicken Wings with Bone
$11.90

